## SAMARA et al. v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. January 14, 1920.)

No. 4.

1. CRIMINAL LAW ⊚═422(6)—ADMISSION BY ONE CONSPIRATOR ADMISSIBLE AGAINST OTHERS.

In a prosecution for conspiring to conceal a bankrupt's assets, an admission by one of the conspirators during the course of the conspiracy is admissible against the other conspirators, although not made in their presence.

2. CRIMINAL LAW ⊚═424(3)—EVIDENCE REGARDING HISTORY OF TRANSACTION DOES NOT VIOLATE RULE AGAINST CONSPIRATORS' STATEMENTS MADE AFTER CONSPIRACY IS ENDED.

In a prosecution, for conspiring to conceal a bankrupt's assets, evidence that the bankrupt's attorney took him before the District Judge and later to the district attorney, to whom he confessed was not rendered inadmissible against his co-conspirators by the rule that a conspirator's statement in the absence of his co-conspirators after the conspiracy is ended is inadmissible, being merely a history of the transaction.

3. CONSPIRACY ⊚═41—PERSON JOINING CONSPIRACY AFTER ITS INCEPTION IS LIABLE.

A person entering a conspiracy after its inception, but prior to its consummation, is deemed a party to all acts done by his co-conspirators, either before or after his entering the plan.

4. CONSPIRACY ⊚═47—EVIDENCE SUSTAINING CONVICTION.

In a prosecution for conspiring to conceal a bankrupt's assets, evidence that accused assisted the bankrupt in making out fictitious bills of sale and carrying away goods *held* to sustain a conviction, although accused was not present at the inception of the conspiracy.

In Error to the District Court of the United States for the Southern District of New York.

Criminal prosecution by the United States against Saleen Samara, Amen Samara, and Saleen Baloutin. Judgment of conviction, and the defendants bring error. Affirmed.

Osborne, Lamb & Wilcox, of New York City (James W. Osborne, Gilbert D. Lamb, and George W. Wickersham, all of New York City, of counsel), for plaintiffs in error.

Francis G. Caffey, U. S. Atty., and E. Paul Yaselli, Asst. U. S. Atty., both of New York City.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. The defendants have been convicted under an indictment which charged them with the commission of two independent crimes. The first count charged them with a conspiracy to commit the crime. The second count charged them with the actual commission of the substantive crime which they are charged with having conspired to commit. So far as the first count is concerned, the conspiracy alleged is one to commit an offense against the United States in violation of section 37 of the Criminal Code, which reads as follows:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any pur-

⊚═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

pose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than ten thousand dollars, or imprisoned not more than two years, or both." U. S. Comp. Statutes, § 10201; Barnes' Fed. Code (1919) p. 2344, § 9715.

The crime charged in the second count was that of a concealment of assets from a trustee in bankruptcy, in violation of the Bankruptcy Act, § 29b, subd. 1, which declares that:

"A person shall be punished, by imprisonment for a period not to exceed two years, upon conviction of the offense of having knowingly and fraudulently (1) concealed while a bankrupt, or after his discharge, from his trustee any of the property belonging to his estate in bankruptcy." U. S. Comp. St, § 9613; Barnes' Fed. Code (1919) p. 2165, § 9113.

This case proceeded upon the theory of a conspiracy between the bankrupts Saleen Antoon and Tonfic Khoury as co-conspirators and aiders and abettors of the bankrupts to conceal assets from the trustee in bankruptcy. Saleen Antoon and Tonfic Khoury, prior to the early part of 1914, were conducting a partnership and engaged in the business of buying and selling oriental merchandise, consisting of silks, linens, kimonos, and embroideries, under the trade-name of S. Antoon & Co., with a place of business in Philadelphia, Pa. In May, 1915, the firm removed to New York City. Among its creditors, and the largest creditor of all, was the firm of Samara Bros., which was composed of Saleen Samara and Amen Samara. The firm of Samara Bros. was established in New York City, and it conducted a wholesale business in oriental merchandise. Another creditor was Saleen Baloutin, also engaged in the same business, and with the two Samaras, defendants herein.

The testimony is that in May, 1915, Antoon and Khoury had a conference with the Samaras, at which the Samaras told the bankrupts that they could not pay their debts, and advised them that they ought to buy as much merchandise in the market as they could, immediately sell it at whatever price available, square accounts with them, put the rest of the money in their pockets, and then declare themselves insolvent; that they later could conveniently start in business again, since the whole matter would be viewed as nothing out of the ordinary, as everybody usually fails and never has any trouble; and that, if they should accidentally get into trouble, they (the Samaras) would unhesitatingly help them out. Antoon and Khoury did not at that conference agree to the Samara proposition and left, saying they would think it over and let them know what they were willing to do the next day. On the following day Antoon and Khoury called at Samara Bros.' place of business and a conversation took place which in substance was as follows:

The Samaras said that they (Antoon and Khoury) were foolish if they did not do what they had told them to do the day previous; that they should do it, and need not be afraid. Antoon, as a result of their persuasion, assured them that they would do it. The Samaras, upon this assurance, instructed them that they should go ahead and buy as much goods as they could giving them names of dealers from whom they should buy on credit, all of whom were recognized as strong competitors of the Samaras. In addition it was further suggested and decided to

have Tonfic Khoury go on the road and sell the merchandise, while Antoon would do the buying; that upon receipt of the merchandise they should send them (the Samaras) enough in quantity to pay their debt without entering it on the books—merely make a memorandum of whatever was sent to the Samaras. Saleen Antoon proceeded to buy from the parties named by the Samaras and others on a credit basis, and within the period of five or six days bought some $12,000 to $13,000 worth of merchandise on credit.

Saleen Samara and Amen Samara had working for them a brother, Elias Samara, one of defendants. As a means of confidential convenience, Antoon sent a great deal of the merchandise that he had bought to Samara Bros.' place of business, by Elias Samara, in bundles, and on one occasion a large case filled with merchandise through Samara Bros.' truckman. The Samara Bros. told Antoon that it was necessary to have a bookkeeper fix the books; otherwise, he would go to jail, and thereupon recommended to him one Nicholas G. Mamary, who was immediately employed by S. Antoon. As the payments on the merchandise that was bought began to become due after the expiration of 30 days, Amen Samara called at the place of business of S. Antoon and asked to see his books, and remarked to Antoon that the books would have to show where the merchandise had been sent, in which case it became urgently important that he should make entries of sales of a fictitious nature. He further told him to call at his house the next day or the day after in the evening, and bring with him the sales book, in order that he might be properly shown how to make and enter the fictitious sales.

As instructed Antoon took the sales book and went to the residence of Amen Samara, and upon arrival found present there Amen, Saleen, and Elias Samara, and Saleen Baloutin, the defendants. It appears that a number of fictitious bills were then made out, amounting to $4,-373.24, more or less. After the fictitious sales had been made out, and the whole matter gone over thoroughly, Saleen and Elias Samara and Saleen Baloutin agreed to call at Antoon's place of business early next morning and be prepared to take all of the merchandise away, except a few things which they thought it would be advisable to leave, so that the other creditors would see that something was left. This was done as had been agreed. A few days later a petition in bankruptcy was filed against Antoon and Khoury.

Antoon before June 15, 1915, not having disposed of all of his merchandise before June 15, 1915, was instructed by Samara Bros. to ship whatever merchandise he had not disposed of to any town he knew of and leave it there. Antoon acted accordingly and sent Khoury away with three trunks filled with merchandise. All of the merchandise contained in one of the trunks was sold by Khoury while traveling, and the merchandise in the other two trunks was stored by him at Oil City, Pa. On September 1, 1915, Antoon, in talking to Samara Bros. about what should be done with the merchandise contained in the two trunks stored at Oil City, was told to go there and sell as much of it as he could, and that whatever merchandise he could not sell he was to ship to them, and they would sell it for him and give him the proceeds. On September 19, 1915, Antoon went to Oil City, emptied the two trunks that

were held there, made up two large packages of the merchandise, and shipped them to Samara Bros.

Immediately following this disposition of the merchandise contained in the trunks, Antoon returned to New York, called upon Samara Bros., and spoke to them concerning the merchandise he had shipped to them from Oil City, and requested the proceeds. In reply, Samara Bros. told Antoon that the money realized from the sale of the merchandise was just sufficient to cover their claim against him, and refused to give him any of the proceeds. The Samaras filed no proof of claim against the bankrupts and refused to contribute the 2 per cent. contributed by the other creditors to defray the expenses of recovering the assets.

Upon testimony to the above effect, as well as testimony upon other matters equally condemnatory, the defendants were found guilty as charged. They now seek to have the judgment reversed, alleging 33 assignments of error.

[1] The error upon which chief reliance seems to be placed is that relating to the admission of certain testimony of one Sitt, a creditor of the bankrupts, who was allowed to testify in effect to oral admissions by Antoon, or to silence tantamount to admissions, made in the absence of the defendants, that the bankrupts had turned over their goods to the Samaras and left other creditors without anything. But, prior to the admission of this testimony of Sitt, Antoon had testified fully as to the conversation which had occurred between the Samaras and himself, and the surreptitious delivery of his merchandise to the Samaras. His testimony, if believed, conclusively established the existence of the conspiracy. The conspiracy had its inception on May 11, 1915, and was still in existence on June 15th, and for some time thereafter. The facts testified to by Sitt occurred on June 15th, the day of the failure. Sitt testified:

"I asked him, why did he give goods to Samara Bros., and he left us without anything; so he did not say anything." "He was just ashamed of us, or something. He did not answer."

It is, of course, true that nothing said by any one of the defendants, after the conspiracy ended and not in presence of the others, could be properly received in evidence against those not making the admissions. But here the conspiracy was not ended at the time of the admission, or the silence which we have said was tantamount to an admission; and as evidence had been introduced to establish a conspiracy testimony as to the acts and admissions of one of the conspirators during the continuance of the conspiracy was admissible in evidence as against the others.

[2] Then it is said that error was committed in allowing the attorney for Antoon to testify that, after the latter had told the former as to his transactions with the Samaras, the attorney took Antoon to the United States attorney's office, which led to the indictment in this case. We are told that this is a clear violation of the rule that what is said or done by one of the conspirators after the conspiracy is ended, in the absence of the defendants on trial, is totally inadmissible. The rule is admitted, but its application to the facts is denied. On his direct examination

Antoon testified that he first went to his attorney and told his story, and that his attorney took him to the District Judge, to whom he confessed his crime. The attorney was permitted to testify that, after Antoon confessed to him, instead of taking Antoon first to the district attorney, he took him direct to the District Judge. This is simply a part of the history of the transaction, and as such the government was entitled to it. The objection at all events seems to us quite unimportant, and we fail to perceive any relation between this occurrence and the rule that the statement of a conspirator in the absence of his co-conspirators, after the conspiracy is ended, is not admissible.

[3, 4] The court was asked at the close of the case to direct the jury to acquit the defendant Baloutin, both on the first and second counts. This the court declined to do, and the refusal has been assigned as error. It would serve no good purpose to review in detail the testimony in its relation to this particular defendant. We have read it with care, and we are entirely satisfied that the court was quite justified in leaving the question of Baloutin's guilt to the jury. It is not at all material whether he was one of the original conspirators or not; for the law is clearly established that, when a conspiracy is once entered into by two or more persons, others may join while it is continuing, and if they do they make themselves liable to the same extent as those who originated it. It is sufficient that Baloutin came into the conspiracy prior to the consummation of the act to be done in pursuance thereof. United States v. Stone (D. C.) 188 Fed. 836. A person coming into a conspiracy after its formation is deemed in law a party to all acts done by any of the other parties, either before or after, in furtherance of the common design. Hedderly v. United States, 193 Fed. 561, 114 C. C. A. 227. And what has already been said justifies the further refusal of the court to charge as requested that:

"The evidence in the case is that Baloutin was not present at the time the alleged oral agreement as to concealing assets was made, nor does it appear the substance was ever communicated to him."

No claim is made that Baloutin was present at the inception of the conspiracy; but it is contended, and the testimony supports the contention, that he joined the unlawful agreement while it was in operation. The testimony, if true, shows that he was present at a meeting of the conspirators on June 14, 1915, at Samara's house, and that he was on that occasion counseling and advising Antoon to make out fictitious bills for the sale of merchandise, to cover the goods given and to be given to the Samaras and to himself. There was evidence, too, that on the following morning Baloutin came early, at 6 o'clock, along with the Samaras, to Antoon's place of business, and helped to carry away the goods. The janitor of the building testifies to his presence, and to his carrying away of the goods, after a conference with Antoon and the others in the office.

The crime of concealing assets and of conspiring to conceal assets the jury thought had been established beyond a reasonable doubt, and this court finds no reversible error to have occurred at the trial.

Judgment affirmed.