GERSON v. UNITED STATES (three cases).

Circuit Court of Appeals, Eighth Circuit.
March 14, 1928.

Nos. 7708–7710.

1. **Conspiracy** ⊚⟿23—Conspiracy to commit a crime is distinct offense from the crime itself.

A conspiracy to commit a crime is a distinct offense from the crime, which is stated as the object of the conspiracy.

2. **Conspiracy** ⊚⟿43(10)—Indictment charging conspiracy against government by fraudulently concealing assets from trustee in bankruptcy held sufficient (Cr. Code, § 37 [18 USCA § 88]; Bankr. Act, § 29b [11 USCA § 52]).

Indictment under Criminal Code, § 37 (18 USCA § 88), and Bankruptcy Act, § 29b (11 USCA § 52), charging defendants with conspiracy to conceal from trustee in bankruptcy of one of their number "certain merchandise belonging to the estate" of A. G., bankrupt, of stated value, "and the cash received from the sale thereof by the said A. G. which said property belonged to the said A. G. at the time of his adjudication in bankruptcy," *held*, sufficient to charge conspiracy to commit offense against the United States by fraudulent concealment of bankrupt's property; identification of the property being sufficient to enable the defendants to know what they were charged with.

3. **Criminal law** ⊚⟿295—Resort may be had to parol testimony to establish identity of offense in subsequent prosecution.

In the event of subsequent prosecution for same offense, resort may be had to parol testimony to establish the identity of the offense.

4. **Conspiracy** ⊚⟿43(12)—Indictment alleging conspiracy to conceal bankrupt's merchandise and cash received from sale thereof held not to limit proof of concealment of cash to that received from concealed merchandise (Cr. Code, § 37 [18 USCA § 88]; Bankr. Act, § 29b [11 USCA § 52]).

In prosecution under Criminal Code, § 37 (18 USCA § 88), for conspiracy to commit offense against the United States by violation of Bankruptcy Act, § 29b (11 USCA § 52), relative to fraudulent concealment of bankrupt's property, indictment alleging conspiracy to conceal "merchandise of the value of $15,945.45, and the cash received from the sale thereof, which said property belonged" to bankrupt, permitted proof of the concealment of moneys realized from prior sales of merchandise, irrespective of whether merchandise sold was concealed.

5. **Criminal law** ⊚⟿805(1)—Court need not in its charge adopt exact language of indictment.

Courts are thoroughly competent to make more concise and clear the extended statements of an indictment, and are not compelled to submit to jury the exact language of the indictment.

6. **Conspiracy** ⊚⟿48—Failure to list merchandise and cash in schedules, alleged in indictment for conspiracy to conceal bankrupt's assets, held sufficiently covered in instructions (Cr. Code, § 37 [18 USCA § 88]; Bankr. Act, § 29b [11 USCA § 52]).

In prosecution under Criminal Code, § 37 (18 USCA § 88), for conspiracy to commit of-

fense against United States by violation of Bankruptcy Act, § 29b (11 USCA § 52), overt act charged in indictment, as alleged failure to schedule merchandise and cash of bankrupt estate were sufficiently covered by court's instructions relative to concealment of cash received for merchandise, in view of entire charge.

**7. Conspiracy ☞27—Intentional concealment of property belonging to bankrupt estate, continued after trustee's appointment, held overt act (Bankr. Act, § 29b [11 USCA § 52]).**

Continuous and intended concealment from trustee of property belonging to estate of bankrupt, even though actual concealment took place before appointment of trustee, was sufficient as overt act under Bankruptcy Act, § 29b (11 USCA § 52), denouncing concealment from trustee of property belonging to bankrupt estate.

**8. Conspiracy ☞27—Alleged purchase and resale by codefendant of bankrupt's stock constituted act done to effect conspiracy to conceal bankrupt's assets, notwithstanding dismissal of conspiracy charge as to such codefendant (Cr. Code, § 37 [18 USCA § 88]; Bankr. Act, § 29b [11 USCA § 52]).**

Alleged purchase and resale by codefendant of bankrupt stock constituted act done to effect object of conspiracy in prosecution under Criminal Code, § 37 (18 USCA § 88), for conspiracy to violate Bankruptcy Act, § 29b (11 USCA § 52), by concealing bankrupt's assets, notwithstanding indictment was dismissed as to such codefendant.

**9. Criminal law ☞530—Affidavit signed by defendant, who declined to make any additional statements when given opportunity, held voluntary and admissible in conspiracy prosecution (Cr. Code, § 37 [18 USCA § 88]; Bankr. Act, § 29b [11 USCA § 52]).**

In prosecution under Criminal Code, §·37 (18 USCA § 88), for conspiracy to commit offense against the United States by violation of Bankruptcy Act, § 29b (11 USCA § 52), affidavit obtained from one of defendants by Department of Justice was admissible as voluntarily made, where affiant was asked if he wanted to make any statement and declined.

**10. Criminal law ☞393(2)—Admission in prosecution for conspiracy to violate Bankruptcy Act of check obtained in depositions taken under order of referee, held not to violate defendant's constitutional rights (Cr. Code, § 37 [18 USCA § 88]; Bankr. Act, § 29b [11 USCA § 52]).**

In prosecution under Criminal Code, § 37 (18 USCA § 88), for conspiracy to commit offense against United States for violation of Bankruptcy Act, § 29b (11 USCA § 52), relating to concealment of bankrupt's assets, check given for stock of merchandise, obtained in depositions taken under order of referee in bankruptcy, *held* admissible, without violating defendant's constitutional rights.

**11. Criminal law ☞432—Failure to produce copy of letter requesting financial statement, held not to render statement inadmissible (Cr. Code, § 37 [18 USCA § 88]; Bankr. Act, § 29b [11 USCA § 52]).**

In prosecution under Criminal Code, § 37 (18 USCA § 88), for conspiracy to commit of-

fense against the United States by violation of Bankruptcy Act, § 29b (11 USCA § 52), admissibility of evidence of financial statement made by bankrupt was not affected by fact that copy of letter in which witness testified statement was requested was not produced.

**12. Criminal law ☞423(1)—Acts of one conspirator, to be admissible as against all, must be done while conspiracy is pending and in furtherance of its object.**

Acts of person committed prior to formation of conspiracy are not admissible against his subsequent coconspirator, but acts, to be admissible against all, must be done while conspiracy is pending and in furtherance of its object.

**13. Indictment and information ☞176—Exact date of offense need not be proved as alleged, provided offense preceded indictment and was within statute.**

Exact date of offense need not be proved as alleged in indictment, provided it is shown that offense was committed prior to indictment and within the statute of limitations.

**14. Criminal law ☞422(3)—Bankrupt's financial statement, if given before alleged conspiracy to violate Bankruptcy Act, was not admissible as against bankrupt's codefendants (Cr. Code, § 37 [18 USCA § 88]; Bankr. Act, § 29b [11 USCA § 52]).**

Financial statement made by bankrupt merchant to clothing company was not admissible in prosecution under Criminal Code, § 37 (18 USCA § 88), for conspiracy to violate Bankruptcy Act, § 29b (11 USCA § 52), as against codefendants of bankrupt, unless statement was made after conspiracy was formed.

**15. Conspiracy ☞47—Conspiracy may be proved by circumstantial evidence.**

Plan or agreement between conspirators may be proved by circumstantial evidence by natural inferences arising from circumstances showing an agreed concert of action in the commission of the unlawful offense.

**16. Conspiracy ☞47—Government in prosecution for conspiracy to violate Bankruptcy Act had burden to show facts and circumstances excluding every other hypothesis than that of guilt (Cr. Code, § 37 [18 USCA § 88]; Bankr. Act, § 29b [11 USCA § 52]).**

In prosecution under Criminal Code, § 37 (18 USCA § 88), for conspiracy to commit an offense against the United States by violation of Bankruptcy Act, § 29b (11 USCA § 52), relating to concealment of bankrupt's property, government had burden to show facts and circumstances in proof of the alleged conspiracy which excluded every other hypothesis than that of guilt, and mere suspicion was insufficient as basis for conviction.

**17. Conspiracy ☞47—Bank's purchase of merchandise alleged to have been fraudulently concealed was not shown in prosecution for conspiracy by affidavit of correctness of claims filed in bankruptcy proceeding (Cr. Code, § 37 [18 USCA § 88]; Bankr. Act, § 29b [11 USCA § 52]).**

In prosecution under Criminal Code, § 37 (18 USCA § 88), for conspiracy to commit of-

fense against the United States by violation of Bankruptcy Act, § 29b (11 USCA § 52), relating to concealment of bankrupt's property, bankrupt's purchase of merchandise, alleged to have been concealed, could not be shown merely by affidavits of correctness of claims filed in bankruptcy proceeding; defendants being entitled to have the evidence against them produced in court and not merely by ex parte affidavits.

18. **Criminal law ⊜552(1)—Inferences arising from circumstances cannot be substituted for circumstances to prove guilt.**

While natural inferences can be drawn from circumstances to prove guilt, such inferences cannot be substituted for the circumstances themselves.

19. **Conspiracy ⊜47—Evidence held insufficient to sustain conviction for conspiracy to conceal from trustee merchandise purchased by bankrupt and proceeds thereof (Cr. Code, § 37 [18 USCA § 88]; Bankr. Act, § 29b [11 USCA § 52]).**

In prosecution under Criminal Code, § 37 (18 USCA § 88), for conspiracy to commit offense against the United States, by violation of Bankruptcy Act, § 29b (11 USCA § 52), on account of concealment of merchandise purchased by bankrupt, and of proceeds therefrom, evidence which failed to show any substantial quantities of merchandise had been purchased *held* insufficient to sustain conviction.

In Error to the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge.

Abraham Gerson, Nathan Gerson, and Ike Gerson were convicted of a conspiracy to fraudulently conceal the property of a bankrupt, and they bring error. Reversed and remanded.

I. J. Ringolsky, of Kansas City, Mo. (McLaury & Hopps and H. F. Tripp, all of Oklahoma City, Okl., and Ringolsky, Friedman & Boatright, M. L. Friedman, and William G. Boatright, all of Kansas City, Mo., on the brief), for plaintiffs in error.

Leslie E. Salter, Asst. U. S. Atty., of Oklahoma City, Okl. (Roy St. Lewis, U. S. Atty., and Fred A. Wagoner, Asst. U. S. Atty., both of Oklahoma City, Okl., on the brief), for the United States.

Before KENYON and BOOTH, Circuit Judges, and MUNGER, District Judge.

KENYON, Circuit Judge. Plaintiffs in error, Abraham, Nathan, and Ike Gerson, hereafter designated as defendants, were tried and convicted upon an indictment charging them and others with conspiracy to commit an offense against the United States by concealing from the trustee in bankruptcy certain merchandise and cash of the estate of Abraham Gerson. Sentences of two years in the penitentiary and a $1,000 fine were imposed as to each. The case was dismissed as to defendants John R. Snyder and Joseph Broida.

The indictment was seasonably attacked by demurrer and motion to quash, both of which were overruled. At the close of the evidence of the government, demurrers were filed to the evidence on behalf of each of the defendants, on the ground that the same was insufficient to prove the guilt of any of them of the crime charged in the indictment, and it was moved to direct the jury to return verdicts of not guilty. The demurrers and motions were overruled. Defendants elected to stand on the demurrers and introduced no evidence. The jury found a verdict of not guilty as to Phillip Gerson and Clara Gerson.

The facts present a tangled web not easily unraveled. As we must review them at length in our discussion of the sufficiency of the evidence, in the interest of brevity and to present duplication, we omit their presentation here further than to say that plaintiffs in error are brothers, Clara Gerson, one of the acquitted defendants is their mother, and Phillip Gerson, another acquitted defendant, is a brother. Abraham Gerson, commencing in 1923, operated a number of clothing stores at different times and at different places in Oklahoma, being assisted in the operation of some of| them by Ike Gerson. Bankruptcy proceedings were commenced against Abraham Gerson in January, 1925, at which time he was operating stores at South Shidler and at Blackwell, Okl. He was duly adjudged a bankrupt.

It is contended that the indictment is insufficient, in that there is no sufficient description of the merchandise and money which it is alleged plaintiffs in error conspired to conceal, and that the indictment does not charge that the kind and character of the merchandise or cash were to the grand jury unknown. This indictment charges as follows:

"That on the 13th day of January, 1925, an involuntary petition in bankruptcy was filed in the United States court for the Western district of Oklahoma against the defendant Abraham Gerson; that thereafter, on the 11th day of February, 1925, said defendant was duly and lawfully adjudged a bankrupt by John J. Hildreth, referee in bankruptcy, to whom said involuntary petition had been referred; that thereafter, and in the regular proceedings of the administration of the said bankrupt estate, one A. L. Smith was duly and legally appointed trustee in bankruptcy

for the estate of the said bankrupt, Abraham Gerson, on the 20th day of February, 1925, and he, the said A. L. Smith, so having been duly appointed, then and thereupon duly qualified as such trustee and entered into bond, which said qualification and bond was duly approved by John J. Hildreth, referee in bankruptcy as aforesaid for said district; that the adjudication of him, the said Abraham Gerson, to be a bankrupt, and the appointment and qualification of the said A. L. Smith as such trustee, aforesaid, was well known to him, the said Abraham Gerson, bankrupt; that shortly before the filing of said involuntary petition in bankruptcy, to wit, on or about 1st day of September, 1924, at Shidler, Okl., within the Western district of Oklahoma, the said defendants Abraham Gerson, Ike Gerson, Phillip Gerson, Nathan Gerson, Clara Gerson, John R. Snyder, and Joseph Broida, did unlawfully, willfully, knowingly, and feloniously conspire, combine, confederate, and agree together, and with each other to commit an offense against the United States, in and by corruptly and fraudulently agreeing together as aforesaid, in anticipation of the involuntary bankruptcy of the said Abraham Gerson, to be brought about and accomplished by the said Abraham Gerson, with the knowledge and connivance of the said other conspirators, unlawfully, willfully, knowingly, and fraudulently while the said Abraham Gerson was a bankrupt, to conceal from the trustee in bankruptcy of the said Abraham Gerson, to be thereafter appointed, certain merchandise belonging to the estate in bankruptcy of the said Abraham Gerson, to wit, merchandise of the value of $15,945.47, and the cash received from a sale thereof by the said Abraham Gerson, which said property belonged to the said Abraham Gerson at the time of his adjudication in bankruptcy."

The indictment further sets forth the exact method by which Abraham Gerson, with the knowledge and connivance of the other defendants, was to work out the proposed scheme, which was: To purchase merchandise on credit and hold sales to convert the same into cash, not paying creditors, and only paying such expenses as were absolutely necessary, the money received from the sales to be withheld from his bank account and placed in possession of the other conspirators; that the merchandise was to be removed from store to store and place to place; that no books of account were to be kept; that he should commit acts of bankruptcy to force the filing of a petition in bankruptcy against him; that he should conceal assets in the form of merchandise and cash and omit the same from his schedule of assets filed in the bankrupt proceeding, and should continue to conceal said merchandise and cash from his trustee in bankruptcy; and that, after bankruptcy, a part of the money concealed from the trustee and placed in the hands of the coconspirators should be returned to Abraham Gerson and Ike Gerson and used in the purchase of Abraham Gerson's bankrupt stock.

Are there sufficient earmarks in this indictment to identify the particular crime charged, viz. a conspiracy under section 37 of the Criminal Code (Comp. Stat. § 10201 [18 USCA § 88]) to commit an offense against the United States by a violation of that part of section 29b of the Bankruptcy Act (11 USCA § 52), reading as follows:

"A person shall be punished, by imprisonment for a period not to exceed two years, upon conviction of the offense of having knowingly and fraudulently (1) concealed while a bankrupt, or after his discharge, from his trustee any of the property belonging to his estate in bankruptcy. * * *"

[1-3] It is to be noted that the language of the indictment is substantially in the words of the statute. It is not questioned that the allegation of the conspiracy under section 37 of the Criminal Code is sufficient. Of course a conspiracy to commit a crime is a distinct offense from the crime stated as its object. This court said, in Anderson v. United States, 260 F. 557, 558:

"As the conspiracy is the gist of the offense, it is undoubtedly true that the offense which it is charged the defendant conspired to commit need not be stated with that particularity that would be required in an indictment charging the offense itself."

The offense here is the conspiring to fraudulently conceal from the trustee *any* of the property belonging to the bankrupt's estate, and is an offense against the duty of the bankrupt to turn over the entire estate to the trustee. The amount concealed is not important and does not affect the crime itself, though probably it would be considered by the court in passing sentence as bearing on the moral turpitude involved in the offense. There are difficulties involved by the very nature of the situation in attempting to describe concealed property. It is peculiarly within the knowledge of a defendant as to what property, if any, he has concealed. Here there is an allegation of concealment as to approximately $15,000 of merchandise and the cash received therefrom. The mer-

chandise and cash referred to are, of course, the merchandise and cash involved in the bankruptcy proceeding. The indictment charges Abraham Gerson was moving stocks of goods from one store to another. Those stocks of goods were his merchandise, and while the term "merchandise" is a comprehensive term, it is apparent that the merchandise referred to consisted of the things bought and sold in trade by him in the stores he was conducting. The bankruptcy proceeding as set forth in the indictment is certainly rather a large earmark, and is a circumstance tending to identify the particular offense charged. Bankruptcy proceedings, it is to be presumed, were not started against Abraham Gerson in other places.

In Kanner et al. v. United States (C. C. A.) 21 F.(2d) 285, 287, a somewhat similar indictment was sustained, the court there saying:

"The purpose of the rule being to enable the defendant to prepare his defense, it would seem that, if ever particularity may be dispensed with, it should be so in the crime of concealing assets. The crime is one which is peculiarly within the bankrupt's own knowledge, and one which may be committed under circumstances which render impossible a description of the assets concealed. Where the very essence of the crime is secreting property, how can it be necessary to allege knowledge of that of which the defendant's own acts prevent any knowledge? It is enough to excuse particularity of description of the manner of committing the offense for the grand jurors to allege that they do not know the details."

The only apparent difference between the indictment in that case and this is that the grand jury here did not allege that a more particular description of the property was to them unknown. In view of the conflicting decisions of this court on the subject, it is difficult to know just where the line should be drawn as to the particularity in an indictment in the description of the offense. This indictment is close to the line, but we think it discloses the essential elements of the offense charged, and that the property alleged to be concealed was sufficiently identified to enable accused to know exactly what he was charged with, and to properly make defense. As to the question of the judgment being a bar in any subsequent prosecution for the same offense, it is to be remembered that resort may be had to parol testimony to establish the identity of the offense. In Bartell v. United States, 227 U. S. 427, 433, 33 S. Ct. 383, 384 (57 L. Ed. 583), the court said:

"As to the objection that the charge was so indefinite that the accused could not plead the record and conviction in bar of another prosecution, it is sufficient to say that in such cases it is the right of the accused to resort to parol testimony to show the subject-matter of the former conviction, and such practice is not infrequently necessary."

See, also, Dunbar v. United States, 156 U. S. 185, 15 S. Ct. 325, 39 L. Ed. 390; Greenbaum v. United States (C. C. A.) 280 F. 474; Keslinsky v. United States (C. C. A.) 12 F.(2d) 767.

Of course, the right to a bill of particulars does not give validity to a void indictment, but this is a case where such bill of particulars might very properly have been asked if defendants did not understand the nature of the charge against them. As the case will have to be reversed on other grounds, defendants will be in position to apply for a bill of particulars, if desired, on a subsequent trial. [4] One of the errors urged is that the court submitted to the jury a different case from that stated in the indictment. It goes without saying that defendants in criminal cases cannot be tried and convicted for offenses not charged in the indictment. On this question the theories of the government and of defendants clash; defendants insisting that the indictment charges the object of the conspiracy was to have the bankrupt conceal from the trustee in bankruptcy certain "merchandise of the value of $15,945.47 and the cash received from a sale thereof," and that this means the cash concealed, if any, must be such as was realized from a sale of concealed merchandise, and that the court's charge permitted the jury to find a concealment of any cash in any amount realized from sales at any stores of Abraham Gerson at any time or any place. That the court took a different view from counsel for defendants of the indictment is apparent from the following excerpts from its instructions:

"This, then, is what the defendants are charged with conspiring to do—that Abraham Gerson should knowingly and fraudulently conceal while a bankrupt the cash proceeds from sales of his merchandise. Understanding, then, what the offense is, you are prepared to take up the charge preferred against the defendants on trial—the alleged conspiracy and the requisite overt acts or act done to effect its object.

\* \' \* \* \* \* \* \*

"You will bear in mind that the conspiracy you may find to be the offense is not the concealment of the merchandise of Abe Gerson, for, concededly, it was sold off before the

appointment of his trustee in bankruptcy, and before it could be known there would be a trustee. The conspiracy you may find to be an offense is the concerted plan kept on foot and existing, to have Abe Gerson conceal the moneys realized from the prior sales of his merchandise, from his said trustee, and at a time after such trustee was elected and qualified. And, if you do not find there was such conspiracy, then the offense fails in this case, and the defendants are entitled to be acquitted."

Of course, the merchandise represented by any cash concealed must have been sold before the appointment of the trustee in bankruptcy. If the wording of the indictment relied on by defendants to sustain this point comprised everything on this subject in the indictment, there would be force in defendants' position, although the practical result would be most incongruous. The wording of that part of the indictment is not clear, but reference to other parts thereof describing the exact method in which the conspiracy was to be carried out tends to clarify the situation. One part of the indictment refers to Abraham Gerson purchasing on credit a large amount of merchandise and the holding of sales for the purpose of converting the same into cash, and the withholding of said money received from a sale of said merchandise from deposit in his bank account and placing the same in the possession of the other conspirators, the removal of the merchandise from one store to another, the failure to keep books of account, and the commission of acts of bankruptcy in order to force the filing of a petition against him. The indictment contemplated a series of successive acts, not one act of concealment, and the allegations thereof taken together show the scheme of the conspiracy was to conceal assets from the trustee in bankruptcy, particularly money from the sale of merchandise, and not merely money received from the sale of concealed merchandise. Defendants rely largely on Gammon v. United States (C. C. A.) 12 F. (2d) 226, but that case we think is readily distinguishable from this. The scheme charged in the indictment there was entirely different from the scheme submitted by the court to the jury. We believe the theory of the trial court in the present case was correct that under the indictment the cash alleged to have been concealed from the trustee in bankruptcy need not have been cash from concealed merchandise.

The next point urged is that the court submitted to the jury two overt acts, neither of which was laid in the indictment, and further that one of the overt acts submitted could not constitute such overt act, as it consisted merely of nonaction on the part of the bankrupt. The two overt acts charged in the indictment which the court submitted to the jury are as follows:

"(6) That on the 7th day of February, 1925, defendant Abraham Gerson filed with John J. Hildreth, referee in bankruptcy, his schedule of liabilities and assets as required by law, and intentionally withheld and failed to list in said schedule assets consisting of merchandise in the sum and value of $15,945.47 and cash received by the said Abraham Gerson from a sale thereof, which said assets and cash belonged to his estate in bankruptcy, and which said Abraham Gerson concealed and continued to conceal from his trustee in bankruptcy after his appointment and qualification.

"(7) That on or about February 24, 1925, defendant Joseph Broida purchased the bankrupt stock of Abraham Gerson at Blackwell, Okl., for the sum of $4,320, and on the same date resold it to defendant Clara Gerson for the same sum plus a commission of $250."

These overt acts were set forth in the court's instruction as follows:

"That, after the appointment and qualification of said trustee in bankruptcy, said Abraham Gerson concealed from said trustee cash received by him from a sale of merchandise.

"That on or about February 24, 1925, Joseph Broida purchased the bankrupt stock of Abraham Gerson at Blackwell, Okl., and on the same date resold it to defendant Clara Gerson."

[5] Courts are thoroughly competent to make more concise and clear the extended statements of an indictment, and are not compelled to submit to a jury the exact language of the indictment.

[6, 7] The sixth overt act above set forth is of course more specifically described in the language of the indictment than in the language of the instructions. But it seems to us that, for all practical purposes, the statements as to the overt act are substantially the same. While there is nothing in the court's reference to the overt acts as to the intentional withholding from the schedule of assets, yet the court in its charge read from the descriptive paragraph of the indictment that part thereof which is as follows: " * * * Conceal assets in the form of merchandise in the sum and value of $15,945.17 and the money derived from a sale thereof,

and omit same from his schedule in bank-ruptcy"—so, taking the court's charge as an entirety, it is apparent that the proposition as to the omission of the assets from the schedules in bankruptcy is fully covered. This overt act is the continuous concealment of property from the trustee, and, while plaintiffs in error insist that this is a mere passive act and therefore cannot constitute an overt act, we think it must be true that a continuous and intended concealment from the trustee of property belonging to the estate in bankruptcy, even though the actual concealment of the property took place before the appointment of the trustee, is sufficient as an overt act. We quote from Collier on Bankruptcy, vol. 1, p. 899, relative to this:

"The offense is completed, if the property was concealed knowingly and fraudulently before bankruptcy, and, on the appointment of a trustee, the bankrupt fails to surrender it or to disclose the disposition he has made of it. A concealment from a trustee after his appointment and a failure to deliver over to him upon demand any property or cash which the bankrupt may have in his possession is an offense as of any date that the concealment continues." Kaufman v. United States (C. C. A.) 212 F. 613, Ann. Cas. 1916C, 466; Alkon v. United States (C. C. A.) 163 F. 810; Morrow et al. v. United States (C. C. A.) 11 F.(2d) 256.

[8] As to overt act No. 7, it is claimed that it was an act of Broida alone, and that his resale to the Gersons could not constitute an act done to effect the object of the conspiracy alleged in the indictment. Broida was one of the defendants in the case. True the indictment was dismissed as to him, but nevertheless he was charged in the indictment as being in the conspiracy. The objections urged as to the statement of the overt acts by the court are highly technical and we think entirely unsound.

[9] Error is predicated on the admission in evidence of the affidavit of Nathan Gerson obtained in November, 1925, by one T. H. Tracy, an attorney at law and special investigator for the Department of Justice. We fail to find from this record any evidence that the affidavit was made under any circumstances of inducement, promise of reward, or threats. The testimony shows that Nathan Gerson stated to Mr. Tracy, when he was asked if he wanted to make any statement, "Surely, there is nothing I am afraid of; I have done nothing." Evidently the statement was voluntarily made, and was clearly admissible as to Nathan Gerson.

Gwinn v. United States (C. C. A.) 294 F. 878; Bergera v. United States (C. C. A.) 297 F. 102; Pandolfo v. Biddle (C. C. A.) 8 F.(2d) 142; Thomas v. United States (C. C. A.) 15 F.(2d) 958; Sherwin v. United States, 268 U. S. 369, 45 S. Ct. 517, 69 L. Ed. 1001.

[10] Defendants urge error upon the part of the court in admitting in evidence certain checks, deposit slips, and other documentary evidence obtained in depositions taken under an order of the referee in bankruptcy; the particular complaint being that the check for $4,320, made by "Clara Gerson, by Phillip Gerson," and delivered to Broida on February 24, 1926, for a stock of merchandise was secured in this manner. If the subpœna had been procured by a government agent, T. H. Tracy, as a part of a scheme to secure this evidence, the question would be quite different from that presented by the record. It fails to show that Mr. Tracy caused the issuance of the subpœna or had anything to do with it. The testimony shows that he did inquire of Phillip Gerson at the time of the examination as to certain income tax matters, and that he had nothing to do with the securing of these exhibits. Therefore the record fails to show that any government representative secured these papers from the owners. They were secured in a civil proceeding pending before the referee and the District Court. The record fails to show any violation of defendants' constitutional rights. We reach this conclusion without considering the questions of how the objection now urged would be affected by the acquittal of Clara Gerson and Phillip Gerson, or whether the question was properly raised in the trial of the case, or could be availed of by codefendants.

[11, 12] Error is also urged in the admission in evidence of a certain financial statement made by the bankrupt on June 25, 1924, to the Knickerbocker Clothing Company. Objection was made to this on the ground that the copy of the letter in which the witness testified the same was requested was not produced, and also because the statement was made long before the conspiracy alleged in the indictment. Of course, the objection as to the letter is frivolous, as the letter was an entirely immaterial matter. If the statement was made before the conspiracy was formed, it was not admissible against any of the defendants other than the bankrupt. Acts of a person committed prior to the formation of a conspiracy are not admissible against his subsequent coconspirator. They must be acts done while the conspiracy is pending

and in furtherance of its object. Brown v. United States, 150 U. S. 93, 14 S. Ct. 37, 37 L. Ed. 1010; Morrow et al. v. United States (C. C. A.) 11 F.(2d) 256.

[13, 14] The indictment charges the date of the conspiracy as September 1, 1924, which is some months subsequent to the time of the statement in question. Of course the exact date of the conspiracy need not be proved. If it is shown that the offense was prior to the indictment and within the statute of limitations, it is sufficient. Bold v. United States (C. C. A.) 265 F. 581; Goldberg v. United States (C. C. A.) 295 F. 447. At the time the attempt was made to introduce this statement, an objection was made on the part of all the plaintiffs in error. The government's counsel stated that the government expected to prove that the conspiracy was in existence at the time the financial statement was dated. If it was, the statement was admissible against all the alleged conspirators. If it was not in existence, it was not admissible as to the coconspirators of Abraham Gerson.

As we reach the conclusion that the government did not establish the conspiracy charged, the question as to the admissibility of this statement becomes unimportant. Its admission against the alleged coconspirators of Abraham Gerson in any further trial of the case will, we assume, be governed by whether or not the alleged conspiracy is shown to exist at the time it was given. This court has dealt with the question in Morrow v. United States, 11 F.(2d) 256. See, also, Allen et al. v. United States (C. C. A.) 4 F. (2d) 688, and Samara et al. v. United States (C. C. A.) 263 F. 12.

In view of our conclusion in this case on the questions now to be considered, the discussion in which we have indulged of the various assignments of error would be superfluous were it not for the probability of another trial.

The assignments of error covering the action of the court in overruling the demurrers to the evidence and refusing instructed verdicts of not guilty raise the serious questions in this case. The court submitted the case to the jury on the theory of a conspiracy based on Abraham Gerson's knowingly and fraudulently concealing from the trustee in bankruptcy cash proceeds from sales of his merchandise.

[15] Proof of a definite plan or formal agreement between conspirators can seldom be shown by direct evidence. Such proof is not necessary. In fact, conspiracy is generally shown by circumstantial evidence, and such is the attempt here. The natural inferences arising from the facts and circumstances may show an agreed concert of action by the alleged conspirators in the commission of the unlawful offense, and that the overt acts were in furtherance of a common design and purpose of the conspirators. Davidson et al. v. United States (C. C. A.) 274 F. 285; Marrash et al. v. United States (C. C. A.) 168 F. 225.

[16] The charge in the indictment was a conspiracy, and the burden was upon the government to show facts and circumstances in the proof of the alleged conspiracy which excluded every other hypothesis than that of guilt. In the recent case of Van Gorder v. United States, 21 F.(2d) 939, 942, this court said:

"In order to sustain a conviction of a crime on circumstantial evidence, it must be such as to exclude every reasonable hypothesis, but that of the guilt of the accused; the facts proved must all be consistent with and point to his guilt only and inconsistent with his innocence." In Turinetti v. United States, 2 F.(2d) 15, 17, it was said by this court: "Whenever a circumstance, relied on as evidence of criminal guilt, is susceptible of two inferences, one of which is in favor of innocence, such circumstance is robbed of all probative value, even though from the other inference, guilt may be fairly deducible." See, also, Union Pacific Coal Co. v. United States (C. C. A.) 173 F. 737; Becher et al. v. United States (C. C. A.) 5 F.(2d) 45.

Mere suspicion is not sufficient on which to base conviction. Turinetti v. United States (C. C. A.) 2 F.(2d) 15.

Submitting the evidence in this case to the tests laid down in these cases, what is the result?

We review somewhat at length, without weighing in any way the same, the evidence, to determine whether the facts and circumstances shown by the government and the reasonable inferences arising therefrom exclude every reasonable hypothesis except that of guilt.

The government claims the following facts have been established by the evidence:

In a general way the operating of clothing stores by Abraham Gerson at different times, commencing in 1922, and at various places, viz. Apperson, De Noya, Lyman, Webb City, North Shidler, South Shidler, and Blackwell (all in Oklahoma), which were operated generally, except the store at Blackwell, under the name and style of the Palace Clothing Company. That on June

25, 1924, Abraham Gerson made a property statement to the Knickerbocker Clothing Company of St. Louis showing assets of $14,-646.75, of which $14,146.75 was merchandise, and liabilities of $5,281.10, of which $4,781.-10 constituted accounts not due for merchandise. That the Knickerbocker Clothing Company shipped $1,400 worth of merchandise on the strength of this statement to Abraham Gerson at De Noya. That eventually the various stores came together, and there remained one store at South Shidler and one at Blackwell, the stock from the other stores having been moved from place to place, and what remained thereof eventually reaching these two stores. That on September 10, 1924, there had been a fire in the North Shidler store, which was then being conducted by Ike Gerson, and that the amount of goods or merchandise, if any, destroyed is not known. That the store at Blackwell was conducted in the name of the Hub Clothing Company, and that Ike Gerson held a lease on the building where this business was carried on, which he had procured from the American Legion, owner thereof. That, after Abraham Gerson had started business at Blackwell, Ike Gerson made a lease of the building in his name for another year from January 1, 1925. That the so-called Hub Clothing Company occupied this building with its store until bankruptcy, Abraham and Ike Gerson being in charge of and conducting it. That the Gersons did the buying and paid the bills; that they kept no books. That a sale was put on at the South Shidler store, the only Shidler store remaining after the fire, which continued for two weeks. That Ike Gerson instructed the party in charge of the Shidler store, one Snyder, not to keep books, but to make out tickets on blank deposit slips in the store, to sell the goods, and send the money by Domar, another employee, to them at Blackwell. That Domar took merchandise every few days from the Shidler store to Blackwell on a truck. That Snyder took in money at the Shidler store and gave the same to Ike Gerson or to Domar, at one time shortly before bankruptcy giving Ike Gerson $150. That Ike Gerson at times put the money in his shoes. That the merchandise of the Shidler store was marked by Ike Gerson, and the clerk sold it at the marked price. That a sale was put on at the Blackwell store for Abe Gerson by one Riley, which continued from October 31, up to November 15, 1924, and that the sales amounted to $3,000. That from December 10, 1924, up until Christmas in the Blackwell store one clerk's sales amounted to $300.

That Abraham Gerson deposited in the Security National Bank at Blackwell from November 1 to November 15, 1924, $414.79 (that is, during the time the sale was carried on), and that from December 10th to December 25th he deposited in said bank $185.-74. That the total amount deposited from November 1, 1924, when the account was opened, to January 23, 1925, when the account was closed, was $1,570.03. That during November and December, 1924, Ike and Abraham Gerson would come to the bank and cash checks and take the cash, often calling for $50 bills. That an involuntary petition in bankruptcy was filed against Abraham Gerson January 13, 1925, and a receiver was appointed who took charge of the merchandise in the Shidler and Blackwell stores. That inventories were taken by the receiver which showed as of date January 26, 1925, merchandise in the Blackwell store $5,887.71, and in the Shidler store $4,749.81, making a total of merchandise in both stores of $10,637.52. That the assets turned over by the bankrupt consisted of merchandise, an automobile, and a small number of accounts receivable. That on February 4, 1925, Abraham Gerson was adjudged a bankrupt, and one Hildreth was appointed referee, who made an order directing the bankrupt to file schedule R–44, and that on February 9th the bankrupt filed such schedule, showing wages due to various people, and priority debts for rent. That schedule A–3 sets forth a list of 110 creditors for merchandise whose claims were unsecured in the amount of—

|  | $31,117.39 | $31,117.39 |
|---|---|---|
| Notes as follows: | | |
| M. Feinberg | 3,500.00 | |
| Wm. Levitt | 1,500.00 | |
| John Snyder | 50.00 | 5,050.00 |
| Wages: | | |
| Elsie Snyder | 110.00 | |
| Fred Domar | 60.00 | |
| Ike Gerson | 150.00 | |
| H. Levi | 900.00 | |
| D. C. Vactor Company | 102.00 | 1,322.00 |

Making total schedule A–3... $37,489.39

That schedule B–2 showed the property of the bankrupt consisting of merchandise, fixtures, and a Ford truck to be of the value of $7,800, and the liabilities to be $38,891.-39. That at the first meeting of creditors a trustee was appointed. That creditors' claims for merchandise which were approved by the bankrupt were acted upon and allowed by the referee, and that these claims aggregated $32,920.07, on which there were credits shown of $1,163.27. That the amount owing

for merchandise purchased after the fire of September 10, 1924, was approximately $22,686.26. That the bankrupt stock was sold by the trustee to one Broida for $4,320. That immediately after Broida had paid the trustee he was served with notice to vacate the building in which the store at Blackwell was located. That afterwards Ike Gerson attempted to buy the stock from Broida, and that Broida, on account of the notice to vacate, sold it to him for $4,820, receiving three checks, one of which was on the First National Bank of Wichita, Kan., for $4,392.50, payable to Joe Broida, and signed, "Clara Gerson, by Phillip Gerson." That Clara Gerson is the mother of Ike, Abe, and Nathan Gerson, and lives at Wichita, Kan., and that on the 22d day of July, 1924, she opened an account in the name of "Clara Gerson, by Phillip Gerson," in the First National Bank of Wichita, and made deposits in various sums between July 22, 1924, and February 25, 1925, aggregating approximately $6,000. That, after payment of the Broida check for $4,392.50 and one check for $30, she had a balance left in the bank of $6.50. That Abraham Gerson contributed $5 per week toward the support of Clara Gerson, his mother, and Nathan Gerson contributed to his mother about $100 during the last six months of the year. That, after the purchase of this stock from Broida, Abraham and Ike Gerson opened a store at Blackwell and conducted the business under the name of Hub Clothing Company, the same as Abraham Gerson had conducted it prior to bankruptcy. That on February 17, 1925, Broida purchased a bankrupt stock at Ponca City, Okl., for $6,520, known as the Max Berg stock, which he sold to Nathan Gerson for $6,900, who paid him with checks on various banks, one for $1,000 on Wichita State Bank, Wichita, Kan., one for $2,000 on First National Bank, Wichita, Kan., one for $2,000 on Home National Bank, Arkansas City, Kan., one for $1,500 on Home National Bank, Arkansas City, Kan., which was the amount of the loan made by Nathan Gerson from said bank on February 16, 1925. That this Max Berg stock of goods also reached the store carried on by Abraham and Ike Gerson at Blackwell. That Nathan Gerson had made large deposits in these various banks, one in the Home National Bank of Arkansas City, Kan., on November 22, 1924, after banking hours, of $1,000 in currency, another of $2,000 in currency in the First National Bank of Wichita, Kan., on December 15, 1924, which remained intact until it was checked out by Nathan Gerson on February 17, 1925, to apply on payment of the Max Berg stock. Another deposit in currency was made in the Wichita State Bank of $1,000, December 29, 1924, which deposit remained intact, and was used as part payment on the Max Berg bankrupt stock. That on April 6, 1925, Abraham and Ike Gerson purchased an automobile for $1,000, paying $500 in cash, balance to be paid in 30 days. That a chattel mortgage was given on the automobile for the balance, signed, "Clara Gerson, by Ike Gerson," and later the note secured by the chattel mortgage was paid by checks signed, "Ike Gerson, by Phillip Gerson."

We are forced to the conclusion from a careful study of the record that the government failed to prove some of the substantial matters included in the foregoing narrative.

The keystone of the alleged conspiracy was that Abraham Gerson should purchase on credit a large amount of merchandise, a part of which at least was to be disposed of and the cash received therefrom secreted from the trustee in bankruptcy. It was vital we think to the government's case to prove, as alleged in the indictment, the purchase of a substantial amount of merchandise. If the allegation of the indictment, that Abraham Gerson purchased a substantial amount of merchandise on credit, and concealed from the trustee the cash received from a sale thereof, is not proved, then there is nothing to sustain the charge of a conspiracy to do this very thing. There is no foundation upon which to build the government's case. From the statement made by Abraham Gerson June 25, 1924, to the Knickerbocker Clothing Company, he had merchandise of the value of $14,146.75 cost-marked. The record shows that after that he received at some of his stores $1,400 worth of merchandise on the strength of that statement. The theory of the government's case rests on the inference to be drawn from comparing this statement with the indebtedness for merchandise that existed at the time of the bankruptcy. How is the latter shown? The government in its argument sets forth and relies on schedule A–3 in the bankruptcy proceeding to prove the same. In the brief of government there appears the following: "Creditors whose claims are unsecured. 110 creditors *for merchandise* $31,117.39." This is not a correct statement of schedule A–3. The words "for merchandise" do not appear in said schedule, but merely the words "creditors whose claims are unsecured." A complete list of creditors was filed, showing a very large number thereof, but nowhere in

that schedule does it appear that these claims were for merchandise purchased. These claims may have been for other matters, improbable as that may seem. If the government could have proved by proper, competent evidence that these claims were for merchandise purchased, it was the government's duty to do so. We cannot be expected in a criminal case to enter into the realm of speculation and assume a vital matter which does not appear in the record. Counsel for government in its brief states:

"Creditors' claims for merchandise bought by Abraham Gerson were filed and allowed by referee for the amounts as shown in Government's Exhibit 15, Abstract of Claims. R. 73–83.

| | |
|---|---|
| Amount of purchases as shown by proof of claim | $32,920.07 |
| Credits shown on claims | 1,163.27 |

R. 83.

Amount owing for merchandise purchased after fire or September 10, 1924:

| | |
|---|---|
| Webb City, after September 10, 1924 | 1,529.75 |
| De Noya, after September 10, 1924 | 11,771.07 |
| Shidler, after September 10, 1924.. | 7,364.36 |
| Blackwell, after September 10, 1924 | 2,021.08 |
| Total | $22,686.26" |

These statements are not in our judgment sustained by the record. An attempt was made by the government to introduce a claim filed in the bankruptcy matter of the Spuntex Knitting Mills. The referee testified he allowed the claim. Objections being made to its offer on the ground that it constituted no proof against defendants of facts appearing on the face thereof, the court said:

"It will be received as prima facie evidence of claim against his estate. That is as far as that goes. I think that modified ruling will be correct."

An abstract of claims in the bankruptcy matter seems to have been prepared, designated as Exhibit 15, which was admitted over the objection of defendants' counsel. It was apparently sought to prove purchase of merchandise by the affidavits supporting the various claims filed in the bankruptcy proceeding. The court held it was competent for the government to show the claims, and that the invoices attached to the proof of claims would be received as prima facie evidence of claims against the estate, but not received as evidence against defendants of the purchase of merchandise; that it (Exhibit 15) would be received only as showing claims entitled to be paid out of the estate, and for no other

purpose. Upon the receipt of Exhibit No. 15 in evidence, the court said:

"I understand that these claims are ex parte matters, and they are not established by the witnesses. The defendant has a right to be confronted with the witnesses against them. This will simply be received as a claim presented against their estate, and not proof at all of the subject-matters. They are the claims as presented, that is all."

Again, with reference to this matter at another point in the trial, the following occurred:

"Mr. Ringolsky: I move to strike out the statements of counsel that the claim was not delivered after a certain date.

"The Court: Motion sustained. I think you are misconceiving probably the force of this evidence. You have no witnesses here for these matters. I think the only purpose for which these claims can be received is to show they are a demand against the estate established according to law and entitled to share in the assets of this estate, and the dates, place of delivery, and time of delivery are of no moment whatever, because they can't be received for the purpose of showing those items."

And counsel for the government said:

"Mr. Salter: I don't think so either. We don't offer them for that purpose."

During the argument of the case to the jury, this same matter arose, and the following proceeding took place during the argument of government's counsel:

"Mr. Salter: The amount of claims introduced before the referee total $32,920.07. I don't know from a strictly technical legal viewpoint what angle you might look at it, whether that is actual proof. It conforms exactly with the amount they listed themselves—

"Mr. Boatright: We object to that statement. There is absolutely no proof here as to what the indebtedness was incurred for—whether goods or something else.

"The Court: I have already held that the only effect of these claims in bankruptcy, the creditors under bankruptcy, is to show their right to participate in the assets of the estate. You haven't any [substantive] evidence here.

"Mr. Salter: No; none whatever. I will leave that matter up to the jury."

[17, 18] The court repeatedly ruled that these claims filed in the bankruptcy proceeding merely showed the right of creditors to participate in the assets of the estate, and were not competent proof against defendants of the purchase of merchandise. That Abraham Gerson purchased merchandise could not

be shown in a criminal case by affidavits of the correctness of claims filed in a bankruptcy proceeding. Defendants were entitled to have the evidence against them produced in court, and not to have proof of vital matters made by ex parte affidavits. We have searched the record in vain to find evidence outside of these matters to establish large purchases of merchandise on credit. There is some testimony of the witness Snyder that merchandise was received at the store where he was working for the Gersons. The record stands with no competent proof as to how much merchandise was purchased. It shows Abraham Gerson had some $14,000 of merchandise in June, 1924; $1,400 worth was shipped from the Knickerbocker Clothing Company after that time, and at the time of bankruptcy he had some $10,000 worth of merchandise in the two stores. As far as this record shows, the merchandise destroyed in the Shidler fire and the merchandise on hand at the time of the bankruptcy might account for all the merchandise on hand in June, 1924, or thereafter received. Therefore a very important link in the chain of evidence is missing, and we are compelled to consider the case from the viewpoint that no large amount of merchandise has been shown to have been purchased on credit or otherwise by Abraham Gerson from June, 1924, up to the time of bankruptcy. There is no showing of whether he paid to creditors any part of what he had received in sales. As far as this record goes, therefore, there is no evidence to show a conspiracy to buy large quantities of merchandise on credit, as charged in the indictment, and therefore it is impossible to reach any conclusion as to what merchandise was converted into cash and concealed, or whether any was. It is no answer to this to say that probably the indebtedness shown was for merchandise. This may be so, but this is a criminal case, where men's liberty is at stake, and, while natural inferences can be drawn from circumstances, such inferences cannot be substituted for circumstances. That the case is full of circumstances more or less suspicious may be conceded. The failure to keep books, the securing of $50 bills, and the carrying of some of them by Ike Gerson in his shoes, the bank account in the name of "Clara Gerson, by Phillip Gerson," the various bank accounts in different places during the time of the sales, the moving of the stocks of goods from one place to another, the manner of buying the automobile, and the giving of the chattel mortgage thereon, the relationship of the parties, the Broida purchase of the Max Berg bankrupt stock

and payment therefor by Nathan Gerson, are circumstances tending to arouse grave suspicion as to the entire transaction, but suspicion is not sufficient to convict of crime. As against these suspicions, it may be suggested that there is nothing in the evidence to show that Clara Gerson was not a woman of means, unless it be said that, because one son contributed $5 a week to her for a period of time and another contributed $100 in six months to her, it must be taken as proof that she could not have had a bank account from proceeds of her own property. There is nothing to show that Ike Gerson did not have property of his own. If Nathan Gerson had not transferred the Max Berg stock which he purchased from Broida over to Abraham and Ike Gerson, there could be no particular suspicion attached to that transaction, because the evidence shows that Nathan Gerson had an active account in the bank at Arkansas City, Ark., and that he made very large deposits therein. That he had some financial worth is shown by the fact that the bank loaned him $1,500 without security. There is nothing in this record to show that Nathan Gerson was not amply able to buy the stock, or that any of the money alleged to have been concealed went into his possession or his account. The government's testimony is that Broida bought the Abraham Gerson stock for himself, and sold it on account of the notice served on him to vacate the building, which the government's counsel surmises was brought about by Ike Gerson.

In considering the testimony of the government, it cannot escape note that, while the evidence shows the bankrupt had deposits in a number of banks the government introduced only the statement of his bank account in the Security State Bank of Blackwell. The evidence shows he had an account in the Guaranty State Bank of Blackwell, in the Shidler Bank, and in the State Bank of De Noya. If the government had this evidence, it should have been introduced. It might have shown that all the money realized from the sales of merchandise was properly used and expended. As this record stands, there is no evidence to show which bills, if any, were paid, or what expenses were paid, or how paid, in carrying on the sales at Shidler and Blackwell. As far as the record is concerned it could as well be surmised that the money received from said sales was used to pay merchandise bills or expenses of the bankrupt or his private debts as to assume that the money was fraudulently and wrongfully secreted.

[19] A calm, candid, and careful considera-

tion of the record in this case (whatever may be the inferences that naturally arise in the mind from the numerous, complicated, and suspicious circumstances and the relationship of the parties) must we think convince, in view of the absence of competent testimony as to the alleged purchases of substantial quantities of merchandise on credit, that the government has failed to prove the conspiracy charged. The circumstances shown are not such as to exclude every reasonable hypothesis but that of the guilt of the accused, nor are they less compatible with innocence than with guilt. The judgment of conviction as to all the defendants is set aside, and the cases are remanded to the trial court for further proceedings.

Reversed and remanded.