GOLD v. UNITED STATES (two cases).
HUSTON v. SAME (two cases).

Circuit Court of Appeals, Eighth Circuit.
November 6, 1929.

Nos. 8383–8386.

George W. Morgan, of St. Paul, Minn., and Abbott W. Sawyer, of Winona, Minn. (Leslie L. Brown, of Winona, Minn., Cleon Headley, of St. Paul, Minn., George D. Welles, of Toledo, Ohio, Stephen H. Somsen, of Winona, Minn., and Christian J. Laurisch, of Mankato, Minn., on the brief), for plaintiffs in error and appellants.

James A. Wharton, Asst. U. S. Atty., of St. Paul, Minn., and S. R. Rush, Sp. Asst. to the Atty. Gen. (Lewis L. Drill, U. S. Atty., of St. Paul, Minn., on the brief), for the United States.

Before STONE, BOOTH, and GARDNER, Circuit Judges.

BOOTH, Circuit Judge. By separate writs of error and by separate appeals William H. Gold and Guy Huston seek to reverse a judgment of conviction against them for making use of the United States mail in violation of section 215 of the Criminal Code (18 USCA § 338).

The judgment against Gold was entered December 3, 1927, the judgment against Huston on December 5, 1927. On January 28, 1928, petitions for writs of error, accompanied by assignments of error, were filed by Gold and Huston respectively. On the same day orders were filed allowing the writs of error. Thereafter, on February 25, 1928, petitions for allowance of appeals were filed by the parties respectively, and orders were entered allowing the same.

Inasmuch as the act of Congress (45 Stat. 54, § 1, title 28, § 861a, U. S. C. [28 USCA § 861a]), abolishing writs of error and substituting appeals, was not approved until January 31, 1928, the proper method of review in these cases was by writ of error. The appeals are accordingly dismissed.

The indictment under which the two plaintiffs in error were convicted was filed in the court below on January 18, 1927. It contained 12 counts. The first count charged that William H. Gold, Glenn W. Gold, Donald W. Gold, William G. M. Smith, Guy Huston, and John E. Huston, on June 15, 1925, and prior thereto, did devise a scheme to obtain money and property from a certain class of persons, called "persons to be defrauded," by means of false and fraudulent pretenses, representations, and promises. It alleged further that it was a part of said scheme that certain of the documents and papers to be used in connection with said scheme should be transmitted through the United States mail. It alleged further that for the purpose of executing the scheme the defendants did on June 2, 1925, place a certain letter, postage prepaid, in the post office at Redwood Falls, Minn., addressed to the New York Joint Stock Land Bank, 61 Broadway, New York, N. Y.

Counts 2 to 10 were similar, but included the mailing of different letters.

Count 12 was based upon section 37 of the Criminal Code (18 USCA § 88), and charged that the defendants continuously from Feb-

ruary 1, 1924, to October 5, 1925, at Redwood Falls, Minn., conspired to commit divers offenses against the United States, viz. violations of section 215 of the Criminal Code (18 USCA § 338), and among them the offenses charged in the preceding counts of the indictment; that thereafter the defendants to effect the object of the conspiracy, did do divers acts, to wit, not only the acts of placing letters in the post office of the United States at Redwood Falls, Minn., as charged in the preceding counts, but also certain other acts. Sixteen other acts are set out, some of them consisting of making use of the United States mail, others not.

Counts 1 and 12 of the indictment are set out in the margin.[1]

All of the defendants pleaded not guilty. They were tried together, the trial lasting between six and seven weeks. During the trial the government dismissed as to the defendant Smith. The jury acquitted defendants Glenn W. Gold, Donald W. Gold, and John E. Huston on each count of the indictment. William H. Gold was convicted on the first count and acquitted on the others. Guy Huston was convicted on the first 11 counts and acquitted on the twelfth. The present writs of error followed.

The record is voluminous, consisting of more than 2,500 printed pages. The assignments of error are very numerous. It will not be possible to discuss them in detail. They may be grouped, however, around a com-

[1] "The Grand Jurors of the United States of America within and for said District in the name and by the authority of the said United States of America, upon their oaths present:

"That William H. Gold, Glenn W. Gold, Donald W. Gold and William G. M. Smith, each late of Redwood Falls, in said District, Guy Huston, late of the City of New York, State of New York, and John E. Huston, late of the City of Chicago, State of Illinois, hereinafter called defendants, on June 15, 1925, and prior did devise a scheme to obtain money and property from a certain class of persons, hereinafter called persons to be defrauded, then resident in divers States of the United States, by means of false and fraudulent pretenses, representations and promises, that is to say; the said persons to be defrauded, whom the said defendants would, by the means hereinafter described, induce to send and pay their moneys and part with their property to the said defendants; the Guy Huston Company, a corporation organized under the laws of the State of Illinois; the Southern Minnesota Joint Stock Land Bank, of Redwood Falls, Minnesota, a land bank association theretofore organized and established and then and there existing and operating and doing business at Redwood Falls, Minnesota, under the laws of the United States; Jackson & Curtis, a brokerage firm of Boston, Massachusetts and New York City; the Milliken and York Company, a brokerage firm of Cleveland, Ohio; George W. York & Company, a corporation of Cleveland, Ohio, and divers other persons, firms, corporations and agencies to the Grand Jurors unknown, for subscribing for and purchasing from said defendants, the said Guy Huston Company, the said Land Bank, the said Jackson & Curtis Company, the said Milliken and York Company and divers other persons, firms, corporations and agencies to the Grand Jurors unknown, shares of stock in the said Southern Minnesota Joint Stock Land Bank of Redwood Falls, hereinafter called Land Bank; that the said defendants further, as a part of said scheme herein described to obtain money and property by means of false pretenses, representations and promises, would and did falsely increase the capitalization of said Land Bank by 12,000 shares, of the par value of $100 each, to 30,000 shares, of the par value of $100 each, or a total increased capitalization of $1,200,000; that the said Land Bank would have and continue its

office and principal place of business at Redwood Falls, Minnesota, and was to and did have the following named defendants elected, appointed and acting officers and agents, to wit: William H. Gold, President, Glenn W. Gold, Vice President, Donald W. Gold, Vice President, William G. M. Smith, Vice President, and Guy Huston and John E. Huston, Agents; and the said following named defendants would be and were elected Directors of the said Land Bank: William H. Gold, Glenn W. Gold, William G. M. Smith, Guy Huston and John E. Huston; and the said Guy Huston Company, dominated and controlled by the said Guy Huston and John E. Huston, would be and was appointed or designated by the Board of Directors of said Land Bank, June 16, 1924, as the fiscal agency for the sale of stock and other securities thereafter to be issued by said Land Bank; and the said Guy Huston Company was further to be used by the defendants as a mouthpiece and convenient fiscal agent in sending out market letters and quotations, quoting false and fictitious prices on said shares of capital stock and securities; that the defendants would further, as a part of said scheme, falsely and fraudulently pretend and represent to the Federal Farm Loan Board of the United States, for the purpose of securing the approval of the Federal Farm Loan Board of the said increase in capitalization and thereby to the sale of the said shares to the said persons to be defrauded, that the business of the said Land Bank then required the said increase in capitalization and thereby the further issuance and sale to the public of farm loan bonds of said Land Bank to the extent of fifteen times said increase in capitalization, thereby causing the said Federal Farm Loan Board to understand and believe that said increase in capitalization was then necessary to the proper expansion of the business of said Land Bank and necessary as a basis for the further issuance of bonds of said Land Bank to the extent of fifteen times said increase in capitalization, and thereafter would and did secure the approval of the said Federal Farm Loan Board to said increase in capitalization, when in fact the business of said Land Bank did not require the said increase in the capitalization by $1,200,000.00 and thereby the further issuance and sale to the public of farm loan bonds of said Land Bank to the extent of fifteen times said increase in capitalization, and

paratively few topics, and we shall take up such of these as we deem the more important.

## I. Was the Evidence Sufficient to Sustain the Finding of the Devising of the Scheme Alleged in the Indictment?

### (a) Prior History of the Southern Minnesota Joint Stock Land Bank.

The scheme is alleged to have been formed "on June 15, 1925, and prior." The first letter relied upon as having been mailed in execution of the scheme is dated June 23, 1924. The details of the alleged scheme centered around the Southern Minnesota Joint Stock Land Bank, hereafter sometimes called the Southern Minnesota Bank. It will therefore be helpful in examining the evidence as to the alleged scheme to know the prior history of this bank.

The Federal Farm Loan Act was passed July 17, 1916 (12 USCA § 641 et seq.). It provided for Federal Land Banks and Joint Stock Land Banks. Both were placed under the supervision of the Farm Loan Board. The Southern Minnesota Joint Stock Land Bank of Redwood Falls, Minnesota, obtained its charter from the Federal Farm Loan Board pursuant to the above act on June 25, 1919. The organizers of the bank were defendant William H. Gold, his brother J. A.

would not and did not thereafter further issue its farm loan bonds to the extent permitted by said increased capitalization, and did not make first mortgage loans to the extent of fifteen times said increase in capitalization, all of which the said defendants then and there well knew and intended;

"That it was further a part of said scheme as aforesaid, that the said defendants would and did incorporate, and caused to be incorporated, under the laws of the State of Minnesota, the Farmers Fund, Incorporated, with its office and principal place of business at Redwood Falls, Minnesota, for the pretended purpose of engaging in the buying and selling of real estate and personal property, to acquire, purchase and hold mortgages, to guarantee the payment of bonds, notes and mortgages; when in truth and in fact, as the defendants then and there well knew, the Farmers Fund, Incorporated, was incorporated, and caused to be incorporated under the pretense of taking title to the lands, real estate and other assets acquired and to be acquired by the said Land Bank, in order that the books and records, the published balance sheets and financial statements of the conditions of said Land Bank would not show to the persons to be defrauded and the public generally, the amount and value of the lands, real estate and other assets acquired and to be acquired by the said Land Bank, thereby causing the assets of said Land Bank to be made to falsely appear in a liquid condition and the said Land Bank to appear to be in a better financial condition than it in fact was, all of which the defendants then and there well knew and intended;

"That it was further a part of the said scheme that the said defendants would and did cause the said Guy Huston Company, Incorporated, to arrange with the said Jackson & Curtis, of Boston, Massachusetts, and New York City, the said Milliken and York Company, of Cleveland, Ohio, the said Geo. W. York & Company, of Cleveland, Ohio, and divers other persons, firms and corporations whose names are to the grand jurors unknown, for the purpose of furnishing and causing to be furnished to said Jackson & Curtis, the said Milliken and York Company, the said Geo. W. York & Company, and divers other persons, firms and corporations to the grand jurors unknown, shares of the capital stock of said Land Bank to be sold and cause to be sold by the said Jackson & Curtis, the said Milliken and York Company, the said

Geo. W. York & Company, and divers other persons, firms and corporations to the grand jurors unknown, to the persons to be defrauded, at a price of not less than $158.50 per share, which said price per share was largely in excess of the yield value of said stock, all of which the defendants then and there well knew and intended;

"It was further a part of the said scheme that the defendants would and did induce said persons to be defrauded to subscribe for and pay for shares of stock in said Land Bank by the means and in the manner herein set forth and that said subscription and information concerning the same would be and was transmitted to the said Land Bank at Redwood Falls, Minnesota, and to its officers and agents, and in the due course of business, the said shares in said Land Bank would be and were transmitted through the United States mails from Redwood Falls, Minnesota, for delivery to the said fiscal agent for further delivery to said Jackson & Curtis, the said Milliken and York Company, the said Geo. W. York & Company, and divers other persons, firms and corporations to the grand jurors unknown, for sale and delivery to the said persons intended to be defrauded, all of which the defendants then and there well knew and intended;

"That it was further a part of said scheme to obtain money and property from said persons to be defrauded by means of false and fraudulent pretenses, representations and promises that the capitalization of said Land Bank would be increased for the purpose of selling to the public the said 12,000 shares of stock greatly in excess of the yield value of said shares and for the purpose of appropriating a large portion of the proceeds arising from the sale of said shares of stock to the use, benefit and gain of the said defendants and to divers other persons, firms and corporations, to the grand jurors unknown, and not to the use, benefit and gain of said Land Bank, all of which the defendants then and there well knew and intended;

"It was further a part of the said scheme that the defendants would also make the following false pretenses, representations and promises in execution thereof to said persons to be defrauded, through and by means of divers printed circulars, letters, financial statements and publications and directly and through agents to the effect:

"(1) That the said Land Bank was then earning and would earn large sums of money and

Gold of Big Stone City, South Dakota, and J. P. Cooper of Redwood Falls. The stock of the bank was originally $250,000 (2,500 shares, par value $100 each), of which J. A. Gold, his two sons, and two others of Big Stone took $125,000; defendants William H. Gold and Glenn W. Gold, his son, and J. P. Cooper took $125,000. All of the stock was paid for in cash. The bank was authorized to do business in Minnesota and South Dakota. Prior to the formation of the bank the defendant William H. Gold and J. P. Cooper had been in the business of making farm loans at Redwood Falls.

The practical working of a joint stock land bank, as described by one of the government witnesses, is, we think, substantially correct. He testified as follows:

"Neither Federal nor Joint Stock Banks are banks of deposit. They are not commercial banks; they are simply a means for making loans for agriculture along the lines provided by Congress."

"Before any loan is made, there must be an application for a loan from the borrower. The law requires such application and does not require it to be sworn to, but this bank did so require. That application states the

was doing a successful and paying business and then earning and would pay large dividends out of the earnings and profits of said Land Bank and the purchase of its said shares and the investment of money therein by the said persons to be defrauded would be a safe and profitable investment and greatly benefit the said persons making such investment, thereby causing said persons to be defrauded to understand and believe that said Land Bank was then earning and would earn large sums of money and that dividends authorized by the Board of Directors at the rate of 10% per share per annum would be paid quarterly on said shares of stock they should so purchase, and said shares of stock would greatly increase in value and that said investments would be safe and profitable investments, when in fact said Land Bank was not then operating at the profit represented and was not then earning and would not earn sufficient money out of which dividends could lawfully be paid, and that a substantial part of the moneys and property that would be and was invested by said persons to be defrauded in said shares of stock, would be and was wholly lost and that the dividends that were paid to said persons to be defrauded were largely paid out of the moneys derived from the sale of said shares of stock of said Land Bank, all of which the defendants then and there well knew and intended;

"(2) That the business of said Land Bank was and would be safeguarded and that the investments made by said Land Bank were and would be restricted to, to wit, banking property; Government and Land Bank bonds; loans on long term first mortgages upon approved agricultural land not exceeding fifty per cent. of the land value and twenty per cent. of the permanent insured improvements thereon and that further restrictions regarding the conduct of the business of said Land Bank were and would be imposed, to wit: mortgaged property must be actually used for agricultural purposes; no single loan may exceed fifteen per cent. of the Bank's paid-in capital stock, and in no case may exceed fifty thousand dollars; borrowers must have title in fee simple; mortgage must be an absolute first lien; all loans must be confined to the providing of capital for agricultural purposes; profits are practically assured once the loans are made and the bonds sold; the integrity of any of the obligations of a joint stock land bank may never be questioned; joint stock land bank stock is unique in that the security of principal and assurance of continuity of income are based on the principal assets permitted

by law, thus causing said persons to be defrauded to understand and believe that the business of said Land Bank was and would be so safeguarded, as aforesaid, and the investments by said Land Bank were and would be so restricted, as aforesaid, thereby further causing said persons to be defrauded to believe that investments in said shares of stock would be safe and profitable investments, when in fact the said defendants would not and did not safeguard the business or restrict the investments made by said Land Bank, to wit, to banking property, Government and Land Bank bonds, loans on long term first mortgages upon approved agricultural land not exceeding fifty per cent. of the land value and twenty per cent. of the permanent insured improvements thereon, nor would nor did said defendants further restrict the conduct of the business of said Land Bank, to wit, to mortgages on property actually used for agricultural purposes; by limiting amount of all single loans to fifty thousand dollars; by requiring all borrowers to have title in fee simple; by requiring all mortgages to be absolutely first liens; by confining all loans to providing capital for agricultural purposes; so as to practically assure profits once loans are made and bonds sold; so as to make the integrity of all of the obligations of said Land Bank unquestionable and so as to assure the continuity of income of said Land Bank based upon the principal assets thereof permitted by law, all of which the said defendants then and there well knew and intended.

"And the Grand Jurors aforesaid, upon their oaths aforesaid, do further present: That the said defendants were further, as a part of said scheme, and in execution thereof, to make from time to time false and fraudulent financial statements of the condition of said Land Bank to the Federal Farm Loan Board and to the public generally, greatly exaggerating and misstating the amount and value of certain of the assets of said Land Bank at the same time falsely representing and concealing the amount and value of certain of the liabilities of said Land Bank, and that said Land Bank was then operating at a substantial profit and had accumulated large reserves, surplus and undivided profits, thereby causing the said persons to be defrauded to understand and believe that said Land Bank was in a prosperous and sound financial condition and that the purchase of said shares of stock would be a safe and profitable investment, and that dividends would be paid quarterly, when in fact the said Land Bank would not be operating at a substantial profit and had not then accumu-

amount of land, kind of land, how farmed, number of acres in crops, number of acres rough land, and the applicant's estimate of value, and a very great mass of information. The Southern Minnesota Joint Stock Land Bank required this application to be signed and sworn to by the applicant himself before the bank would do anything about the loan at all.

"The application comes into the bank and is usually checked over roughly by someone in charge of loans in the bank. If he finds it isn't in territory where they want to operate, or can see it is a loan he doesn't want, or it is not in proper form, then it goes back, refused, or to be put in form. Then it is given to a Federal Appraiser who goes out and personally inspects the land. This appraiser, under the law, is appointed by the Federal Farm Loan Board, itself—works under regulations and rules given him by the Farm Loan Board, is responsible to the Farm Loan Board, but is carried on the payroll of the bank. The Board directs him how to do his work, and if he does not comply with the rules and regulations of the Farm Loan Board, or proves himself incompetent, then the power to remove him is in the Board,

lated large reserves, surplus and undivided profits from operation all of which the said defendants then and there well knew and intended.

"And the Grand Jurors aforesaid, upon their oath aforesaid, do further present: That in the formation and execution of said scheme said defendants, on June 2, 1925, at Redwood Falls aforesaid, in said District of Minnesota and in the Second Division thereof, and within the jurisdiction of this Court, and in attempting so to do for the purpose of executing said scheme, unlawfully, willfully, knowingly and feloniously did place and cause to be placed a certain letter and envelope, postage prepaid, in the post office establishment of the United States, addressed to the New York Joint Stock Land Bank, 61 Broadway, New York, N. Y., and which said letter and envelope had then and there enclosed therein, in execution of said scheme, ten certain certificates of stock of said Southern Minnesota Joint Stock Land Bank, and which said letter was in substance and to the effect following:

"'June 2, 1925.

"'New York Joint Stock Land Bank, 61 Broadway, New York, N. Y. Gentlemen: We are enclosing herewith ten (10) stock certificates of this bank for 1000 shares each, numbered 4754 to 4763 inclusive, issued in the name of Guy Huston Company.

"'You may deliver these certificates to the Guy Huston Company when called for by them.

"'Will you kindly acknowledge receipt of these certificates, and oblige

"'Yours truly,

"'WBC:LG                    Secretary.

"'Enc.'

"That at the time of placing and causing to be placed the said letter and envelope, having enclosed therein the said stock certificates, in the post office of the United States as aforesaid, the defendants then and there well knew that said letter and envelope and said stock certificates were for the purpose of executing said scheme; against the peace and dignity of the United States, and contrary to the form of the statute of the same in such case made and provided."

"Twelfth Count.

"And the Grand Jurors aforesaid, upon their oath aforesaid, do further present that: William H. Gold, Glenn W. Gold, Donald W. Gold, William G. M. Smith, Guy Huston and John E. Huston, whose first or Christian names are to the Grand Jurors unknown, except as herein stated, and being the identical persons named in the first count of this indictment, and hereinafter called defendants, continuously throughout the period of time from February 1, 1924, to October 5, 1925, at Redwood Falls, Minnesota, in the Second Division of the District of Minnesota and within the jurisdiction of this Court, at New York, New York, at Saint Paul, Minnesota, and at divers other places to the Grand Jurors unknown, did conspire, combine, confederate and agree together and with each other and with divers other persons to the Grand Jurors unknown, to commit divers offenses against the United States, to wit: Violations of Section 215 of the Penal Laws of the United States, and among said violations, to commit the divers offenses charged against said defendants in the preceding counts of this indictment; and the said defendants did thereafter do divers acts to effect the object of said unlawful and felonious conspiracy, to wit: Not only the several acts of placing and causing to be placed, letters, and shares or certificates of stock, in the post office of the United States at Redwood Falls, Minnesota, and taking and causing to be taken letters from the post office of the United States at Redwood Falls, Minnesota, and unlawfully causing them to be sent and delivered by the post office establishment of the United States as charged in the preceding counts of this indictment, but by numerous other acts of preparing letters and shares or certificates of stock for mailing in the post office at Redwood Falls, Minnesota, and divers other places, in this indictment set forth, to be sent and delivered by the post office establishment, mentioned in the first count of this indictment, and of making to said persons to be defrauded, the false and fraudulent pretenses, representations and promises in said first count described, and obtaining by means thereof, the moneys and property of the said persons to be defrauded, directly or through agents and by the unlawful use of the post office establishment of the United States, as well as certain other overt acts in furtherance of and to effect the object of said unlawful conspiracy now here specified, that is to say:

"1. That the said defendants did, on or about June 16, 1924, at Redwood Falls, Minnesota, enter into an agreement with the Guy Huston Company, a corporation organized and existing under and by virtue of the laws of the State of Illinois, whereby the said Land Bank engaged the said Guy Huston Company, Incorporated, as its fiscal agent for the sale of stock and other securities thereafter to be issued by said Land Bank." Here follow allegations of other overt acts.

which has the right to hire and fire him. That appraiser is responsible to nobody, but the Farm Loan Board.

"The Federal Appraiser personally inspects the farm and character of the applicant, and reports back, covering in detail a large number of questions with reference to the land, and the loan, and the man asking for it, and in that report the appraiser is required to make a statement, or recommendation, as to how much he considers should be loaned on that application, if any."

"After the appraiser's report is made, the application goes to the Loan Committee or directors of the bank, who have to pass on these loans, who can cut down or reject as to the amount recommended by the appraiser, but cannot allow a higher amount.

"The law requires satisfactory title [or] which may be by abstract, insurance certificate or Torrens certificate; the title must be certified to be good by an attorney.

"After the application has passed through the foregoing procedure, the loan papers are made out, note and mortgage, mortgage recorded, recording shown on the abstract. The abstract then goes back to the attorney for his certificate, and having gotten all that done, the bank can give the money to the borrower."

In regard to bonds issued against these mortgages, the witness said:

"In depositing mortgages with the Registrar as security for bonds, the mortgages must be assigned to the Registrar, and bonds can be issued against them after securing approval of the security by the Federal Farm Loan Board. If they are approved mortgages, you may borrow up to their face. The bonds may be sold at par, or at premium, or at a loss, if the Farm Loan Board approves. The law allows the bank a difference of one per cent. between the amount of interest the bank pays on its bonds and what it gets on the mortgages, provided the mortgage rate must not exceed 6 per cent. By the machinery that Congress has provided, by the Farm Loan Act, a bank with a capital of a quarter of a million dollars to start with, by loaning and putting up mortgages, borrowing on bonds, and loaning again, and repeating this process, can loan not only the original capital, but the original capital, and fifteen times more.

"As to the profits of the bank, assuming that there would be no expense of operation and no loss, if the bank loaned out all its capital at 6 per cent., it would produce an income of 6 per cent. on the capital, and on each of the 15 times that mortgages were put on farms the bank would get a spread of 1

per cent., which would make 21 per cent. on the capital, if there were no expenses or loss and everything is loaned out at the maximum rate. After a surplus has been provided in addition to the capital, bonds can be issued against the surplus, as well as the capital, in that case, the bank could have the advantage of issuing bonds to the extent of 15 times their surplus, as well as their capital, and if the bank got its surplus up to where it was 20 per cent. of the total capital, that would increase the return on the par value of the stock 20 per cent., so that, if the bank had a surplus of $20 a share, the bank would get a return of not only the original 21 per cent., but 20 per cent. of that, which would be, roughly, $5 more, making about 26 per cent., if there was no expense and no loss. That was the plan devised by Congress and put into operation in this law."

"Against the 21 per cent. must be figured expenses, losses, and the reserve required.

"The law requires the bank to carry to reserve 25 per cent. of its net earnings each six months until the reserve amounts to 20 per cent. of the capital of the bank, and thereafter 5 per cent. of the net earnings must go to reserve once a year. The money put into reserve is available to loan to borrowers.

"As to expansion of capital stock, after the bank has loaned its capital and has issued bonds up to 15 times that amount, the bank can only make additional loans as fast as borrowers pay; it cannot issue any more bonds against the mortgages until more stock is sold. If the bank wants to go on serving the community, if there are people that want to borrow money on these favorable terms, the bank must issue more stock and the law provides for that. Such stock is sold to any one who wants to buy it, and the proceeds of the stock loaned out and the bonds issued against mortgages the same as before."

"In Joint Stock Land Banks, borrowers are not compelled to take stock, but may, if they wish."

"As to the powers of the Farm Loan Board, no loan can be put up with the Registrar unless it has been passed by a Federal Appraiser and approved by the Farm Loan Board; a bank cannot issue any stock unless and until that Board approves the issue. The bank cannot issue bonds except with the approval of that Board."

The Southern Minnesota Joint Stock Land Bank started in business. Appraisers were appointed by the Farm Loan Board to make appraisals for the bank. By November, 1919, it had nearly $2,000,000 loans on its books. By January 1, 1920, it had about $2,820,000. In the fall of 1919 an

attack was made in the courts on the constitutionality of the Farm Loan Act. This made it difficult for the bank to sell its bonds, but it used them as collateral for money borrowed from banks in order to complete mortgage loans already begun. In December, 1919, it stopped making loans and canceled about $4,000,000 of applications. The expenses of the bank were reduced, but it ran at a loss down to the fall of 1921. Assessments were made upon the stockholders to meet the deficit. After the Farm Loan Act was held constitutional by the Supreme Court in 1921, the bank again began the sale of its bonds. Upwards of $2,000,000 were sold by February, 1922. About $700,000 loans were made between January 1 and May 1, 1922, when the capital stock limitations were reached. Loans then outstanding were approximately $3,750,000.

The Southern Minnesota Joint Stock Land Bank was a member of the American Association of Joint Stock Land Banks. In attending the meetings of that association William H. Gold had become acquainted with defendant Guy Huston, who was president of the association, and who had been instrumental in building up the Chicago Joint Stock Land Bank. The Southern Minnesota Bank had not been able to sell its bonds at as favorable a figure as the Chicago Bank had sold its own bonds. Mr. Gold and his associates in the Southern Minnesota Bank in the spring of 1922 thought some of liquidating the bank. Mr. Huston had in mind the organization of another Joint Stock Land Bank in Minnesota. The outcome of the situation was that a contract was made between the Southern Minnesota Bank and Mr. Huston June 19, 1922. It was afterward assigned to the Guy Huston Company. The contract recited,

"Whereas said Bank is desirous of making arrangements for the sale as hereinafter provided of Ten Thousand (10,000) shares of its capital stock of the par value of One Hundred Dollars ($100) per share, to be hereafter issued, and for the sale of its issues of bonds to the aggregate principal amount of Fifteen Million Dollars ($15,000,000) to be hereafter issued."

The contract appointed Huston sole representative of the bank to sell the stock and bonds mentioned; it provided that Huston should buy 1,000 shares of the stock at 115 per share and should use his best efforts to sell the remaining 9,000 shares at 115, and to retain as his compensation any excess of price over 115, except that as to the second half of the 10,000 shares his profit, if any, should be divided equally with the bank. The bonds were to be sold at the best price obtainable, but at a price to net the bank at least 101, unless the bank and Huston should agree on a lesser price. Huston was to get $10 for each $1,000 bond sold, payable one-tenth each year for 10 years. In addition, Huston was to have $20 for each bond as sale costs. On the second one-half of the $15,000,000 bonds he was to receive not more than one-fourth of 1 per cent. profit in any case.

The contract further provided that Huston might buy all of the stock and bonds at a price equal to the best obtainable elsewhere. The contract was to remain in force until all of the stock and bonds were sold, but the stock was to be sold by January 1, 1924. If the stock was not taken up as the needs of the bank expanded, demand might be made on Huston on September 1, 1922, or any time thereafter to take up 500 shares per month. The bank agreed not to make any contract for the sale of stock or bonds until the 10,000 shares of stock and the $15,000,000 bonds were sold, unless by written consent of Huston.

Huston sold all but $1,500,000 of the bonds and all but 1500 shares of the stock before the contract of 1922 was canceled by agreement in December, 1923. This cancellation contract was made to enable the bank to carry out an arrangement with J. S. Bache & Co. to handle the sale of its stock in connection with the merger of the Southern Minnesota Bank and the First Joint Stock Land Bank of Minneapolis, hereinafter mentioned. The cancellation contract with Huston was made effective in April or May, 1923, although not signed until December, 1923. This cancellation contract recited that there would become due to Guy Huston Company the sum of $150,000 upon completion of the contract of June, 1922, and the Southern Minnesota Bank in consideration of the cancellation of the contract promised to pay said sum in twenty semiannual installments of $7,500 each, commencing July, 1924.

The Minneapolis Joint Stock Land Bank, above mentioned, was organized under the same act as the Southern Minnesota Bank, and had 100,000 shares of $5 each. Two or more men, referred to as the Strausses, owned 53,000 shares. Owing to the death of one of these men, this block of stock was for sale. William H. Gold made an examination of the assets of the Minneapolis Bank and found its loans of good quality. The bank had $6,500,000 of first mortgage loans. It operated in the same territory as the Southern Minnesota Bank. Negotiations for the sale of the Minneapolis Bank were carried on, not only with Mr. Gold, but also with certain interests

which controlled the Des Moines Joint Stock Land Bank. Mr. Huston was identified with those interests. Finally, on May 22, 1923, the purchase of the Minneapolis Bank was made by the Southern Minnesota Bank. The merger was approved by the Farm Loan Board. Part of the stock of the Minneapolis Bank was obtained by exchange for the stock of the Southern Minnesota Bank. Part of the stockholders of the Minneapolis Bank wished cash. Five thousand shares of the stock of the Southern Minnesota Bank were issued, known as merger stock. Money to pay for the Minneapolis Bank stock, which was to be paid for in cash, was raised by William H. Gold and other officers of the Southern Minnesota Bank by negotiating their personal notes, secured by the Minneapolis Bank stock, with banks in New York and Chicago. Later this Minneapolis Bank stock collateral was replaced by merger stock of the Southern Minnesota Bank. This stock of the Southern Minnesota Bank used as collateral, known as merger stock, was carried in the names of William H. Gold and other officers of the bank, instead of by the bank itself, on the advice of the Farm Loan Commissioner.

Guy Huston had nothing to do with bringing about the merger of the Minneapolis Bank and the Southern Minnesota Bank.

This merger stock, so carried by some of the officers of the Southern Minnesota Bank, was sold later, partly through J. S. Bache & Co. and partly through Guy Huston Company. The expense of selling this merger stock and of clearing the secondary market was reimbursed by the Southern Minnesota Bank to the officers and persons who had carried the stock for the bank, by the payment of dividends on the stock while it was so carried.

The situation of the Southern Minnesota Bank in the Spring of 1924 was about as follows: It had paid dividends of 8 per cent. per annum from July 1, 1922, to January, 1923; 9 per cent. from January 1, 1923. It had made loans as follows:

| | |
|---|---|
| 1919 | $2,839,850 |
| 1920 | 6,000 |
| 1921 | 154,500 |
| 1922 | 8,214,600 |
| 1923 | 8,779,600 |

These figures do not include the loans taken over from the Minneapolis Bank of upwards of $6,000,000. These loans had been taken in accordance with the Farm Loan Act and under the safeguards therein provided. It had carried through a successful merger with the Minneapolis Bank. Its capital stock was $1,800,000. The sale of its stock and bonds after the termination of the 1922 con-

tract with Mr. Huston was much less successful than it had been under that contract. There existed some delinquencies.

| | |
|---|---|
| Delinquent interest on farm loans.. | $261,830.00 |
| Lands acquired.................... | 212,145.69 |
| Tax certificates................... | 122,099.96 |

But they were not unusually large in comparison with the volume of business done. Such was the condition of the bank at the time of the alleged making of the scheme to defraud.

### (b) Outline of the Alleged Scheme to Defraud.

The main parts of the scheme as set out in count 1 of the indictment were:

That William H. Gold should be president of the Southern Minnesota Bank; Glenn W. Gold, Donald W. Gold, and William G. M. Smith, vice presidents; that the same parties and Guy Huston and John E. Huston should be directors; that the Guy Huston Company should be the fiscal agency of the bank for the sale of its stock and bonds, and for sending out letters quoting false and fictitious prices on the securities.

That there should be formed a corporation to be known as the Farmers Fund, Incorporated, for the pretended purpose of dealing in real estate and personal property, but in fact for taking the title to lands which had been acquired by the bank, thereby causing the assets of the bank falsely to appear to be in a liquid condition and the bank to appear to be in a better condition than it in fact was.

That the stock of the bank should be increased from 18,000 shares to 30,000 shares.

That false representations should be made to the Farm Loan Board that the business of the bank required the increase of the stock as a basis for the further issuance and sale of bonds as provided by the Farm Loan Act.

That the Guy Huston Company should arrange with various brokerage firms to furnish them with the new stock of the bank, to be sold to the "persons to be defrauded, at a price of not less than $158.50 per share, which said price per share was largely in excess of the yield value of said stock," and known by defendants so to be; that this was done for the purpose of appropriating to the use of defendants and divers other parties a large share of the proceeds of the sales.

That the defendants should make representations to the "persons to be defrauded" in the following particulars, all of which were false to the knowledge of the defendants:

(1) That the bank was earning large sums of money; that the bank would pay large dividends out of profits; that the purchase of

the stock of the bank would be a safe and profitable investment; that a dividend of 10 per cent. per annum would be paid; that the stock would greatly increase in value;

(2) That the investments of the bank would be restricted to banking property, government and Land Bank bonds, long term first mortgages on agricultural land not exceeding 50 per cent. of the land value and 20 per cent. of the improvements, and subject to other restrictions as provided by the Farm Loan Act.

### (c) The Huston Contract of 1924.

The appointment of the Guy Huston Company as the fiscal agency of the bank was accomplished by the contract dated May 15, 1924, and adopted by the board of directors of the bank June 16, 1924. The contract recited that the bank proposed to issue and sell additional shares of its capital stock, and that the Guy Huston Company had theretofore sold stock and bonds for the bank in a manner satisfactory to the bank. The contract appointed the Guy Huston Company sole and exclusive representative of the bank for the sale of its stock which it proposed to issue, and for the sale of its bonds to be issued. Section 2 of the contract provided that the Guy Huston Company should use its best efforts to sell the stock at such prices as the parties deemed for the best interests of the bank. Section 3 provided that the bonds should be sold at such prices as the parties deemed advisable, but at a price which would net the bank not less than 101 (unless the parties agreed to a sale at a less price). Sections 4, 5, and 6 read as follows:

"4. The said second party shall be entitled for its compensation for services rendered in negotiating the sale of stock, at the rate of two and one-half dollars ($2.50) per share for each share sold hereunder, but this shall apply only to stock issued in addition to the eighteen thousand (18,000) shares now outstanding, and stock cancelled and reissued shall not be considered as new stock; said compensation of two and one-half dollars ($2.50) per share on new stock shall be due and payable when stock is issued and has been paid for.

"5. The said second party shall be entitled for its compensation for services rendered in negotiating the sale of bonds, at the rate of two and one-half dollars ($2.50) for each one thousand dollar bond sold by it hereunder. Bonds sold to refund outstanding bonds to be considered the same as new issued. The compensation for the sale of each bond to be paid at the time of sale.

"6. The second party is hereby authorized to purchase any or all of said shares of stock or any or all of said bonds, or to sell the same to others, either in its own name or in the name of the said Bank, the said shares of stock to be purchased by the second party at a price as provided for in section 2, and the said bonds to be purchased by the second party at a price equal to the best price then obtainable therefor from others as aforesaid, provided that the second party shall be entitled to compensation as provided in sections 4 and 5."

Section 10 provided in part as follows:

"* * * If the Guy Huston Company shall fail to secure the sale of the stocks and bonds of the Bank as herein provided within ninety (90) days after being requested so to do by the Bank, at the end of such ninety (90) days the Bank shall be free to employ the services of others to perform such services with respect to such sale without any accountability to the Guy Huston Company for the compensation [hereinafter] in paragraphs 4 and 5 hereof mentioned with respect to the bonds and stock so sold."

Section 12 provided in part as follows:

"12. The Guy Huston Company * * * shall have the right to make field inspections * * * and if the second party shall find that excessive or improper loans are being carried, steps shall be immediately taken to correct such conditions, even to the extent of discharging such person or persons responsible therefor."

Section 13 provided that the contract should remain in force for 20 years from May 15, 1924, unless previously terminated by mutual consent.

There is nothing on the face of the contract which indicates fraud, or any intention on the part of the parties thereto to defraud. On the contrary, the provisions of sections 12 and 13 tend to negative the idea that the contract was part of a scheme to defraud.

It was generally agreed by parties interested in the bank that a fiscal agency was necessary. The experience of the bank since the termination of the former Huston contract tended to prove such necessity.

R. A. Cooper, who was Farm Loan Commissioner at that time, testified as follows:

"I think a fiscal agent for a bank of this character is very necessary, if it is going to do business in considerable volume.

"In the first place, you need some one who is familiar with the technique, you might say, of investment banking, to distribute your securities to the best advantage. Then, with

any bank that issues bonds in considerable volume, you find a great many purchasers who desire to change their investments, and your securities will come back into what they call the secondary market. Unless you have some one to repurchase those bonds and redistribute them to bona fide investors, you will have a very unsatisfactory market in the making of new offers.

"If you do not have some one to take care of that secondary market, the bank will be offering a new issue when its older issues are being offered to new purchasers; the effect will be to depress the market in those particular securities below the actual intrinsic value those securities should have. This is true of both bonds and stocks, for the same reasons. This matter of protecting the secondary market is essential both for joint stock land banks and federal land banks."

W. A. Streater of Mankato, Minn., one of the directors of the Southern Minnesota Bank at the time, and who had been placed on the board at the instance of the Northern Trust Company of Chicago, and who made reports to that company from time to time, testified as follows:

"I was a director of the Land Bank at the time the 1924 contract was made with Mr. Huston, and was in favor of it, for the reason that in my opinion it would give the bank an outlet for its securities, and by so doing would furnish the bank with loanable funds."

William H. Gold, one of the defendants, wrote to Mr. Landes, member of the Farm Loan Board, November 26, 1924, as follows:

"This Bank undertook to handle its own stock and bonds direct with bond houses, who apparently were not giving us adequate protection and not furnishing a substantial secondary market. Arrangements were then made with the Guy Huston Company of New York. $25,000 was placed in his hands with the understanding that he at all times would furnish us with a list of Joint Stock Land Banks bonds, either our own or on other Joint Stock Land Banks carried with these funds, and they stand ready at all times to do this.

"The advantages accruing to our Bank by virtue of the contract with the Guy Huston Company are already very apparent. The market for our bonds is stiffening every day and when the Bank gets ready to dispose of its bonds we are confident that it will gain at least 1% over and above what could have been secured direct from the bond houses.

"The small commission received by Guy Huston Company will be exceeded many times by the premiums accruing to the Bank in the sale of both its stocks and bonds in the future. Actual experience has demonstrated this."

### (d) The Farmers Fund, Incorporated.

Prior to June, 1924, the Southern Minnesota Bank had acquired certain lands in the course of its operation, by foreclosure of mortgages and otherwise. This was due in large part to the depression in agriculture which existed from 1921 to 1924. The officers of the bank thought that these lands should be disposed of to a separate corporation and handled by it. The matter was taken up with members of the Farm Loan Board, and the plan of the separate corporation was approved by them. Accordingly, the Farmers Fund, Incorporated, was formed May 15, 1925, with a capital of $100,000. The lands owned by the Southern Minnesota Bank were conveyed to it for a cash consideration of $75,000, and mortgages taken back covering the full amount of the mortgage loans originally made upon the lands by the Southern Minnesota Bank, together with all costs and disbursements. In addition, the Golds and Guy Huston gave bonds in the total sum of $100,000 to cover any possible loss which might be sustained by the Farmers Fund, Incorporated, in connection with the transfers of said real estate. That this plan of having a separate corporation take over the lands thus held by the bank was a very common one, the court will take judicial notice; that the plan was approved by members of the Farm Loan Board, and that it was for the best interest of the bank, is established by the uncontroverted evidence.

The government contends that the formation of the Farmers Fund, Incorporated, was a mere subterfuge; that whatever capital it had was furnished by the Southern Minnesota Bank. A careful examination of the evidence convinces that the capital was furnished by Guy Huston—$75,000 in cash and $25,000 in credit on the books of the Guy Huston Company; $15,000 of this credit was shortly paid over; that the stock of this corporation was taken and owned by him with a double liability attached; that the transaction was bona fide and without the intention on the part of any one to defraud; that later on, when the Farmers Fund, Incorporated, was taken over by the Farms Company of Massachusetts, and it became necessary to increase the capitalization, $135,000 more was furnished for that purpose by Guy Huston. In return he took B stock in the Farms Company of Massachusetts, an issue subordinate to the A stock. That one of the

purposes in forming the Farmers Fund, Incorporated, was to transform certain non-liquid assets of the Southern Minnesota Bank into liquid assets, is clear from the evidence; that the purpose was accomplished is also clear; and that such purpose was legitimate and without intent to defraud any one, is equally clear. The record, when analyzed, furnishes no substantial evidence to the contrary of these conclusions.

### (e) Increase of the Stock of the Bank.

On February 10, 1925, the board of directors and the stockholders at their respective meetings authorized an increase of stock from $1,800,000 to $3,000,000; i. e., 12,000 shares. At that time the bank had made loans amounting to $26,900,000 in round numbers. It still had a leeway for making loans of $1,500,000, and it had applications for loans equal to that amount. Clearly, if the bank was to expand its business, an increase of stock was necessary as a basis for an issue of further bonds. The Farm Loan Board knew of the proposed issue of stock. Commissioner Cooper testified:

"I discussed with W. H. Gold, on one occasion that I recall, and also with Mr. Huston, the matter of increasing the capital stock of the Southern Minnesota Bank. I think that began in 1924."

"After these conversations with Mr. Gold and Mr. Huston, the capital stock of this bank was increased. At those conversations, I knew the bank had acquired some land, and believed it would have to take on more. I told Mr. Gold I thought it would be advisable to increase his capital stock, so he could take care of all good applications that I believed at that time were available to the bank.

"I had on my desk at the time, which I think I either showed him or told him about, a report covering this territory, and particularly the territory in which the Southern Minnesota Bank was operating, which showed that during a period of four or five months previous, mortgage loans in the sum of about $19,000,000 had been made by companies other than Federal or Joint Stock Land Banks, and that made me believe that there must be available here good business which the bank could take, if it had the necessary capital and was able to sell those bonds, and which it would be desirable for the bank to do."

As far back as July, 1924, W. H. Gold had favored an increase of stock. Early in 1925 it was the opinion of the Golds that they could make loans amounting to $15,000,000 within the next two years. Glenn Gold testified as follows:

"In early 1925, the Southern Minnesota Bank had not loaned up to 15 times its capital—within about $1,500,000.00. In April, 1925, we had sold so many bonds that $40,000.00 of stock had to be paid in so the bank could finish delivering the $2,000,000.00 of bonds to the Guy Huston Company, that they had sold for them. Some time in April, 1925, the bank had loaned as far as it could, without selling more stock, except for such money as would be paid in on mortgages."

"On February 28, 1925, the bank reports to the Farm Loan Board, the bank reports applications awaiting closing $889,000.00. On April 30, 1925, the bank had, awaiting closing, $751,000.00, and on May 31, 1925, $686,000.00. $407,000.00 worth of applications were received during May. Of course, there would be a considerable weeding out on that. We were not making that many loans, because that list would be pruned."

"If the bond market remained in the condition it was at that time, the capital could be loaned out during the balance of the year 1925 and 1926."

"Q. You are speaking about this new issue of stock, this 11,000 share issue? A. Yes, the 11,000 share issue."

"The bond market was in good condition at that time, and the stock market also in good condition to sell stock, and there was a demand in the field for the loans this bank could make. In order to extend, in an efficient way, as it should be done, there should be three things working together, a good stock market, so the stock will bring the price it ought to; a good bond market, so the bonds can be sold on favorable terms; and a good demand for loans. All three of those elements were present during May and June, 1925, when this stock was issued."

William G. M. Smith, a director and one of the defendants who was acquitted, testified relative to the increase of stock as follows:

"Prior to this time the bank would take on an organization to handle a good line of loans and just about the time that this organization was going in good shape, they would be either unable to dispose of the stocks or bonds, and the result was that their organization would have to be cut and slowed up, and they were unable to keep up the best cont[r]act with their correspondents. The figures were submitted at that time, showing that the potential loan field in which we were working was, oh, I should say, would absorb five or six times the amount of the bonds issued and stock."

Mr. Streater, another director, testified as follows:

"I voted for * * * the expansion of the bank, in the year 1925, the issuing of the new stock that was issued that year. I was not very enthusiastic about as large an expansion, but I did approve it and voted for it. I believed that there was a very fair volume of applications for loans available."

"I knew of the depression that has been described here, between the years 1921 and 1924. In the latter part of 1924, and early part of 1925, it was my opinion that conditions were gradually improving, and that was one of the things I took into consideration in voting for that increase in stock."

"I thought the sale of that stock and the making of loans, based on that stock, and in general the future of the bank would work out well, and I voted for it."

Mr. Huston testified:

"I was getting reports from Washington daily, almost, of the splendid condition of the crops through this territory, through the whole corn belt, as a matter of fact. And the corn was worth $1.25 then, and we were figuring on its going higher. The Department of Agriculture was very enthusiastic on that at that time. The election was over and the economists were saying that we were going to have six to ten years of the greatest era of prosperity that America had ever known."

"I came to Chicago, and visited the Federal Reserve Bank, and all the other banks, that have country correspondents through this community. I had gone to the Metropolitan Life Insurance Company, in Newark, N. J., and visited the vice president that has charge of the farm mortgages.

"When I arrived in Chicago I visited the office there of their farm mortgage department, handling this section through here, and they were telling me of the general comeback and the soundness of values, and I was tremendously surprised when they told me that they had advanced their general loaning rate per acre approximately 20 per cent. in southern Minnesota."

"I made a very thorough investigation, and every one was so sure that the bottom had been reached, and that the turn had come, that there remained practically no doubt in my mind that the situation had definitely turned. I was furnished from Des Moines, a list of more than 200 farms that had sold for over $200 an acre in the last 30 days, at that time. * * * I could not find any one but that was sure that things were coming right. Then I saw Mr. Gold and talked about the increase in stock of the bank, and I told him that I thought this was the time to increase the stock; that the market was in such condition that stock would sell. I felt that bonds would be of a much better price, and that we had the market in very good shape for the bonds, having sold $2,000,000 at approximately one point, or half a point to a full point above the general level of the market on Joint Stock Land Bank bonds at that time. The general stock market was getting lots better. The general level of stocks was 10 to 20 points above what it had been 12 months before, all of which were favorable indications."

All of these men were mistaken in the views they held early in 1925 as to the outlook for the future business prosperity of the bank. They did not foresee the agricultural depression which set in during 1926. Nor did they foresee the change in policy soon to be made by the Farm Loan Board in regard to the payment of dividends and in regard to the handling of lands acquired under foreclosure. But in passing upon the guilt or innocence of these defendants, in respect to this increase of stock, due consideration must be given to the facts and circumstances as they saw them in 1925. Erroneous judgment may be as consistent with good intentions as with bad. And in this matter of the increase of stock, we think the record fails to show any substantial evidence of bad faith or intent to defraud on the part of the defendants. At most, the evidence shows erroneous judgment on their part when considered in the light of subsequent events.

(f) The Sale of the Stock and the Alleged Fraudulent Representations in Connection Therewith.

Of the 12,000 shares of stock of the new issue 1,000 shares were sold to Guy Huston Company in April, 1925, at 133, to net the bank 120 and accrued dividends. The government does not claim any false representations in regard to this sale, though criticism is offered of it in other respects. The remaining 11,000 shares were bought by Guy Huston Company at 140 net to the bank, according to the contention of the defendants. The government contends that there was no sale to the Guy Huston Company, but that the stock was sold to the public through Guy Huston Company as fiscal agent of the bank, and that Guy Huston Company appropriated part of the proceeds of the sale which should have gone to the bank. The government contends further that in connection with the sale of the stock to the public various false representations were made by the defendants.

Inasmuch as the contention of the govern-

ment that there was not a sale to Guy Huston Company has but an indirect bearing upon the main question involved in the case, we shall not discuss it at length, but simply state that in our opinion the evidence conclusively shows that the sale of the stock was made by the Southern Minnesota Bank direct to the Guy Huston Company, and by it in turn was sold through various syndicates to the public; that the profit made by Guy Huston Company was not inordinate, nor was the price paid for the stock by the public excessive, when due consideration is given to the facts, and to surrounding circumstances as they appeared at the time.

The alleged false representations relied upon by the government in connection with the sale of the stock to the public are largely contained in a printed circular (Exhibit 100 substituted), copies of which were distributed in the latter part of May, 1925, through various brokers by mail and otherwise to investors interested in stocks. The alleged false representation most largely relied upon by the government is found in the following statement contained in the circular:

"Dividends: The initial dividend was declared as of July 1, 1922, at 8%. In January, 1923, the rate was increased to 9% and in May, 1925, the board of directors announced that the dividend rate of the capital stock had been increased from 9 to 10 per cent. The increase to be effective July 1, the first quarterly dividend of $2.50 per share will be paid October 1, 1925."

It is the contention of the government that this statement is a representation not only as to the actual payment of past dividends, but also a representation that such dividends had been earned. This contention as to the meaning of the statement is conceded by the defendants. There is no claim that the dividends were not in fact paid as stated; but the question remains whether such dividends had been earned. The books of the bank were kept on what is known as the accrual basis, but the government contends that in determining whether dividends had been earned the books should be considered on the cash basis. However, the government witness McHale testified as follows:

"Q. The Farm Loan Board always has required these joint stock land banks to keep their books on an accrual basis so that these books, in choosing the accrual basis system, were being kept on the system that the Farm Loan Board directed all the time this bank was in operation? A. Yes, sir.

"Q. And the Farm Loan Board in figuring whether dividends have been earned or not, during all the period since organization of this bank, have based their figures on an accrual basis, rather than a cash basis, haven't they? A. The Farm Loan Board, in figuring dividends to be paid, yes, sir.

"Q. So in figuring on an accrual basis here, you are figuring on the basis that was authorized and directed and continuously used, and the only method that was ever used by the Farm Loan Board itself? A. Yes, sir."

Mr. McHale, after an exhaustive examination of the books of the bank, testified that the showing from the books on the accrual basis was as follows:

"That sum of $426,494.99 is the total sum from organization to June 30, 1925, which was available from earnings for distribution as dividends. The total amount of dividends declared and paid in that same period was $483,125.00, leaving a net deficit of $56,630.-01. In other words, they had paid $56,630.01 more in dividends than was available from the net earnings for the payment of dividends."

In reaching this conclusion Mr. McHale did not use the premiums received by the bank on stock sold during the period in question in making his set-up of the legal reserve of the bank. He took instead the sum of $145,334.95 from earnings to fill the reserve. He testified, however, that if it was proper to use premiums on stock to fill up the reserve, thereby relieving the net earnings to that extent, then the books of the bank showed more than enough earnings to pay all the dividends. The question and answer were as follows:

"Q. Well, now, so there will be no question —if it be true that stock premiums can be used to fill up the legal reserve, and if it be true that the amount of net earnings which would then remain in the bank's account, could be under the law applied to dividends, then this bank had in its net earnings account, enough to pay all dividends that it ever paid, and $88,704.94 besides? A. I assume that would be correct."

Furthermore, Mr. McHale in his tabulation did not allow stock premiums to be used in paying the cost of getting new business. The uncontradicted testimony showed that it was the custom of Joint Stock Land Banks to use stock premiums to build up their reserve and to pay for the cost of new business; that this question had been up before the Farm Loan Board and that the banks were told that the Board would not object to such use. Whether such use of the stock premiums was in accordance with law, we are not called upon to decide. The court below in the course

of the trial took the view that it was not, but later charged the jury that such use was legal. What we do decide is that, in view of the facts and circumstances disclosed in the instant case, such use of stock premiums cannot be said to be unwarranted and without reasonable basis; that defendants believed that all dividends had been paid out of earnings; that when such use is recognized in calculating the amount of net earnings properly allocated to dividends, the uncontradicted evidence shows that all dividends paid up to June, 1925, had in fact been paid out of net earnings; and that there was no false representations in reference to such payments.

It is further contended by the government that the statement in the circular (Exhibit 100 substituted), that beginning July 1, 1925, the dividends on the stock would be 10 per cent., was a false representation as to the earning power of the stock. We lay to one side the possible answer to this contention: That the statement was as to an expectation rather than as to a fact. We take up the question whether the defendants honestly believed that future dividends of 10 per cent. would be paid, and whether they had reasonable grounds for the belief. Glenn Gold, one of the defendants, testified:

"There was no question in our minds at all that, the minute that we got out those bonds and mortgages under that new stock issue, that we would be earning our full 10 per cent. very easily.

"Q. And what was the opinion and belief of yourself, and the other officers of the bank at that time, May 12th, and in June, 1925, as to whether or not that the Southern Minnesota Bank had actually earned, and was able to pay all the dividends that it had paid in the past? A. We knew that it had earned it."

And again:

"Q. Now, there would be a period—I am assuming now that the farm depression had not dropped back again in 1925, in the fall, and 1926, in the spring—if things had turned the corner, and gone on normally, would there have been a period between the time that this stock was sold and the time that you got the full 15 times bonds behind it, where the earning of your bank would not be so great as it would be later, when the 15 times bonds got behind the stock? A. Yes, sir; they would have been.

"Q. And did you men, you officers of the bank, consider as to how—as to whether the bank was going to have enough earnings and assets on hand to take care of the 10 per cent. dividend during that period? A. We took that into consideration, and figured on that."

He gave in detail the figures on which he based his belief.

William H. Gold testified that the matter of a 10 per cent. dividend had been discussed as early as October, 1923. July 29, 1924, he wrote Guy Huston, stating that he believed conditions warranted an increase of dividend to 10 per cent. March 26, 1925, he wrote to Guy Huston:

"I have just been making some figures showing the estimated net earnings to July 1st, adding $21,000 premium on the premium on the present bond sale, and after deducting the April and July dividends, it will leave us about $340,000 net. If, at that time 5,000 shares of stock could be sold to net the bank $145 and three (3) million bonds to net the bank around $102, it would push the profit account up over $600,000, and I think half of the three million of new mortgages could be put out at 6% and the other half at 5½%.

"I would estimate the bank then could easily net 12%, and with its 20% and better set up, could pay 10% dividends, and set up around $50,000 a year in its surpluses."

April 16, 1925, he wrote to the same party:

"Our earnings for April, May, and June will approximate $54,000, making a total of $444,000, and leaving a net of a little over $400,000 after the July 1 dividends have been paid. This would leave us over 20% on $1,900,000 capital with our tax matter still unsettled."

Defendant William G. M. Smith, one of the directors, testified:

"As to the increase of the dividend to 10 per cent., beginning March 1st, the figures submitted to me showed there would be adequate earnings to take care of a 10 per cent. dividend."

Defendant Guy Huston testified:

"It was my opinion that the bank would be able to pay and maintain a 10 per cent. dividend rate. The increased business, the capital stock paid in, would permit a large amount of increase of loanable funds through the sale of bonds, and the profit from that business would be very substantial. If I can refresh my memory, I can tell you exactly. Selling stock at $140 a share, under the plan then in general use, whereby you could use the premiums on stock to pay for legal reserves, and pay the cost of new business, on that basis, the capital account, legal reserve set up, and the earnings, 5½ per cent., is $79,200 annually, $18,000,000 of bonds could be issued, on which there was approximately

a 1 per cent. differential annually, or $180,-000, making a total gross possible income of $259,200, for this stock increase.

"Q. (by Mr. Sawyer): That is, on the new business alone? A. On the new business alone. A 10 per cent. dividend would be $120,000, leaving available for losses and expenses, an annual profit of $139,200. Now, that is taking no account for premiums on bonds. We are just assuming that the bonds would be sold at par."

"At the time this stock was sold to the public, I was sure the bank had actually earned and had available for dividends all the dividends it had paid in the past."

He also gave in detail the figures on which he based his belief.

W. A. Streater, one of the directors (not a defendant), testified:

"Q. And in your duties as a director, did you keep track in a general way with what the earnings of the bank were? A. I gave that some attention. I made some estimates at times.

"Q. So that in voting for that increase in dividend you were not simply blindly following the figures handed you by W. H. Gold at that meeting? A. I would not say that I was.

"Q. And was it your own independent judgment, from what you knew of the conditions and the earnings of that bank in the past, that that 10 per cent. dividend could probably be maintained? A. It was, providing that the bank could go ahead and sell some bonds and increase its amount of shares."

Much correspondence was had in the fall and winter of 1924 between William H. Gold and Guy Huston relative to raising the dividend rate to 10 per cent. Misgivings and doubts were expressed at one time or another by each of them. In the spring of 1925 all of the circumstances seemed favorable to such a step, and it was taken. This correspondence to our mind shows integrity of purpose, instead of a scheme to defraud. Misgivings and doubts are indicative of honesty rather than of villainy.

The foregoing evidence; the fact that dividends of 9 per cent. had been earned and paid; the testimony that it was the belief of the defendants, as well as of others well informed, that the agricultural depression was about over; the absence of any substantial evidence to the contrary—lead irresistibly to the conclusion that the defendants honestly believed and had reasonable grounds to believe that a dividend of 10 per cent. could and would be paid on the stock of the bank.

Another contention of the government is that the circular (Exhibit 100 substituted) was false, in that it did not set up as a liability the sum of $135,000 still to be paid to Guy Huston under the contract of 1922, as provided in the cancellation contract of December, 1923.

The statement in the circular was made up from the books of the bank. No such liability had ever been entered on the books of the bank. The evidence shows that the bank and Huston had proceeded on the theory that the installment payments should be made from time to time as the bank realized earnings from the loans made from the moneys derived from the bonds which Huston had sold under his contract. The payments were treated as in the nature of salary or expense items, rather than the whole sum as a liability. The payments were charged by the bank as an operating expense. The expert accountants were not agreed at the trial how the $135,000 should be handled from a bookkeeping standpoint. We do not think that a fraudulent intent can be inferred from such a state of facts.

A further contention of the government is that a false representation is found in the circular (Exhibit 100 substituted) in the statement:

"Its loans outstanding as of May 12, 1925, were $28,362,800.96, on which amortization payments have been made to the amount of $833,616.24. These loans are secured by first mortgages on corn land farms in the southern section of Minnesota and in the extreme eastern section of South Dakota. These farms have been appraised for loan purposes at over $68,000,000."

Included, either in whole or in part, in the total $28,362,800.96, was the mortgage of $500,000 given by the Farmers Fund, Incorporated, already described. The government contends that the whole plan of the Farmers Fund, Incorporated, was a subterfuge, and further that the $500,000 mortgage was not in any event a first mortgage.

We have already considered and disposed of the former contention. As to the character of the $500,000 mortgage, the evidence shows without dispute that the lands conveyed by the bank to the Farmers Fund, Incorporated, were lands which had been duly appraised and on which first mortgage loans had been made by the bank. It further appears that these mortgages had been duly filed with the registrar. Some of these mortgages being in default had been withdrawn from the registrar, had been foreclosed, and the title to the lands had been taken in the name of the bank. These lands were conveyed to the Farmers Fund, Incorporated, and the

$500,000 mortgage taken back covered the original amount of the loans on the lands, together with costs and other items chargeable against the lands. It is difficult to see why the $500,000 mortgage was not a "first mortgage" as to these lands. Of course, this $500,000 mortgage could have been separately stated in the circular and a history of the same given.

In the case of Mandelbaum v. Goodyear Tire & Rubber Co., 6 F.(2d) 818 (C. C. A. 8), the question was involved whether in a prospectus for the sale of stock of a corporation the omission to discuss and analyze certain items amounted to fraud. The prospectus failed to disclose that the company had built a clubhouse for the use of its employés at a cost of $1,500,000. This omission was urged as constituting fraud. The court said (page 822):

"We do not think that the failure to discuss this item in its prospectus could be regarded as a concealment of the company's condition amounting to fraud. As well might it be contended that it was the duty of the Goodyear Company to disclose in its prospectus its entire previous course of business, in order that it might be judged whether its management had been judicious and free from criticism."

A prospectus such as was involved in the Mandelbaum Case and in the case at bar is not intended to be a complete and detailed history of the financial transactions of the corporation.

There were also mortgages which had become in default, and title to the lands covered thereby had been taken by the bank without foreclosure in the name of a trustee or a nominee. These mortgages were still with the registrar. The lands covered by these mortgages were also conveyed to the Farmers Fund, Incorporated. Disbursements made by the bank in connection with acquiring the title to these lands, and other expense, were reimbursed to the bank by the Farmers Fund, Incorporated, either by the $75,000 which was paid by it to the bank, or by being included in the $500,000 mortgage. To the extent that such disbursements were included in the mortgage it was a second mortgage. The exact figures are not disclosed by the record. If, therefore, the whole of the $500,000 mortgage was included in the total $28,362,800.96, stated in the circular to be the amount of the first mortgages, it would follow that there was a misstatement of fact to the extent indicated. It is also true that certain "other assets" were conveyed by the bank to the Farmers Fund, Incorporated, in return for the $75,000 cash

and the $500,000 mortgage. If any of these "other assets" were represented by the mortgage, and if the whole of the mortgage was included in the total of loans stated in the circular, then there was a misstatement of fact to that extent. The amount of these "other assets" is not shown with exactness; but the evidence does show that the amount must have been small.

The statement in the circular was in our opinion, however, substantially correct, and we think the discrepancies noted, when considered in connection with all the facts and circumstances, do not support the charge of false representation.

We have now discussed at some length the more important details of the alleged fraudulent scheme set out in the indictment; the other details alleged have been examined and considered, but will not be discussed. We have also discussed a number of the alleged false representations which are claimed to have been made in connection with the alleged fraudulent scheme. The remaining alleged false representations have also been examined and considered, but will not be discussed.

In considering a case of the character of the one at bar, several well-established rules must be borne in mind:

(1) Where the alleged scheme involves the sale of stock of a corporation, an inquiry of considerable importance is whether the corporation has for a substantial length of time been organized and conducting a legitimate business. Mandelbaum v. Goodyear Tire & Rubber Co., supra; Corliss v. United States, 7 F.(2d) 455 (C. C. A. 8).

(2) Business adversity, especially in times of abnormal business conditions, does not necessarily spell fraud. Corliss v. United States, supra.

(3) Good faith of a defendant in a prosecution for making use of the United States mail in carrying out an alleged scheme to defraud is ordinarily a complete defense. Durland v. United States, 161 U. S. 306, 16 S. Ct. 508, 40 L. Ed. 709; Rudd v. United States, 173 F. 912 (C. C. A. 8); Sandals v. United States (C. C. A.) 213 F. 569.

(4) Where all of the substantial evidence is as consistent with innocence as with guilt, a conviction cannot be sustained. Turinetti v. United States, 2 F.(2d) 15 (C. C. A. 8); Grantello v. United States, 3 F.(2d) 117 (C. C. A. 8); Edwards v. United States, 7 F.(2d) 357 (C. C. A. 8); Bishop v. United States, 16 F.(2d) 410 (C. C. A. 8); Dickerson v. United States, 18 F.(2d) 887 (C. C. A. 8); Van Gorder v. United States, 21 F.(2d) 939 (C. C. A. 8); Salinger v. United States, 23

F.(2d) 48 (C. C. A. 8); Gerson v. United States, 25 F.(2d) 49 (C. C. A. 8); Philyaw v. United States, 29 F.(2d) 225 (C. C. A. 8).

Applying these rules to the evidence in the case at bar, we are of the opinion that the alleged fraudulent scheme and the alleged false representations are without substantial support in the record, and that the items of evidence pointed out by the government as supporting the indictment are as consistent with the innocence of the defendants as with guilt on their part, and that a verdict of not guilty should have been directed by the trial court.

We deem it advisable, however, to advert to several errors occurring at the trial, and which in the opinion of the court require a reversal of the judgment.

## II. Rulings on Evidence.

■ Evidence of various kinds was allowed to be introduced tending to show a drop in the price of the stock of the Southern Minnesota Bank from May, 1925, to the time of the trial in November, 1927; the purpose of the evidence being to establish that the prices in May and June, 1925, were fictitious and caused by the alleged fraudulent representations. The evidence was plainly inadmissible. Many factors might have intervened to affect the price unfavorably, and the uncontradicted evidence in the case showed the existence of a number of such unfavorable factors after the sales in May and June, 1925. The ruling in the Mandelbaum Case on a similar point is controlling here.

■ Evidence was allowed to be introduced showing the amount of compensation Guy Huston received from the Southern Minnesota Bank for selling its bonds prior to the transactions here in question; also that he received compensation from several other Joint Stock Land Banks for selling their securities. We think this evidence was inadmissible. Those transactions were entirely independent of the scheme alleged in the indictment. It was not shown or offered to be shown that all of the transactions were part of one system or plan being carried out by Guy Huston. It was not claimed that what was done by Guy Huston for which he was being tried was done unwittingly or unintentionally. On no ground that occurs to us were his independent dealings, either with the same bank or with other banks, admissible to prove the charges made against him in the indictment in the case at bar.

■ After the sale of the 11,000 shares of stock of the Southern Minnesota Bank was made, a considerable amount of the sales money belonging to the bank was carried temporarily with the Guy Huston Company. The government, over objection, introduced evidence showing that during the time when this money of the bank was being carried by the Guy Huston Company a loan was made by that company of $100,000 to one Walter Cravens, and that this loan was not repaid. There was no showing that the money loaned to Cravens came from the funds of the bank which were being carried by the Guy Huston Company, and, on the other hand, there was conclusive proof that all of the moneys so carried were repaid at the proper time by the Guy Huston Company to the bank. Clearly the evidence as to the Cravens loan had no place in the case at bar.

■ The witness J. J. Minot, Jr., was allowed to testify, over objection by defendants, that he was told by Mr. Chambers, an employé of the Guy Huston Company, that the bank was to receive $147.50 per share net for its stock. Mr. Huston made no such statement to Mr. Minot; nor was he present when Mr. Chambers so told Mr. Minot. Mr. Chambers was not alleged in the indictment to be a conspirator, nor was he shown to have any authority from Mr. Huston to make such a statement. Furthermore, he testified that at the time he made the statement to Mr. Minot he did not know the provisions of the contract between the Guy Huston Company and the bank. The statement of Chambers to Minot was clearly inadmissible.

## III. Charge of the Court to the Jury.

■ On the question whether unearned premiums had been paid, the court charged as follows:

"You are advised that stock premiums, when received, became a part of the surplus account of the bank, and that they might properly have been used to fill the reserve account of the bank, or to pay the expense of securing new business, thereby releasing considerable amounts of net earnings for the payment of dividends, but that such stock premiums could not properly have been used for the direct payment of such dividends. In determining, then, whether the dividends were warranted and were paid out of the proper funds, you may take into account these several rules applicable to the various funds of the bank."

This being the law of the case, there was no issue of fact for the jury to decide relative to payment of unearned dividends. For, on the theory of the law as stated, the uncontradicted evidence was that the dividends in question had been paid out of earnings. It

**34**

was error, therefore, to submit to the jury the question whether the dividends paid had been earned. C., St. P., M. & O. Ry. Co. v. Kroloff, 217 F. 525 (C. C. A. 8), and cases cited.

We think it unnecessary to discuss the other numerous matters covered by the assignments of error.

For the reasons which we have stated, the judgment as to each of the defendants is reversed.